*EXHIBIT R*

JEFF GREENWELL - CONFIDENTIAL; February 13, 2019

Page 1

```
 1                UNITED STATES DISTRICT COURT
 2          WESTERN DISTRICT OF WASHINGTON AT SEATTLE
 3   _____
 4   DALE SKYLLINGSTAD,           )
     individually,                )
 5                                )
                  Plaintiff,      )
 6                                )
           vs.                    )  2:18-cv-00648-BHS
 7                                )
     NATIONAL RAILROAD PASSENGER  )
 8   CORPORATION d/b/a AMTRAK,    )
                                  )
 9                Defendant.      )
     _____
10
11        VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF
12                         JEFF GREENWELL
13                       ***CONFIDENTIAL***
14   _____
15
16
17                         9:33 A.M.
18                     FEBRUARY 13, 2019
19              1420 FIFTH AVENUE, SUITE 4200
20                     SEATTLE, WASHINGTON
21
22
23
24   REPORTED BY:  JUDY STEENBERGEN-WEBB, CCR NO. 2495
25
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

Page 126

1  those the eastbound trains?
2     A. Eastbound and the non-Cascades Amtrak trains
3  that operate south to LA.
4     Q. Like the Coast Starlight down to Los Angeles
5  and the Empire Builder to Chicago?
6     A. Correct.
7     Q. Now, you were asked some questions about some
8  of these exhibits, if I could see that stack of
9  exhibits.
10        Showing you what was marked as Exhibit Number
11 4, which the front page is General Order Number 3
12 Sounder Commuter Rail Division, second page is General
13 Order Number 2 Sounder Commuter Rail Division, and the
14 third page is General Order Number 1 Sounder Commuter
15 Rail Division.
16        Are these Amtrak-generated documents?
17    A. No, they are not.
18    Q. Would those have come from BNSF?
19    A. As noted on the document itself, yes. It
20 comes from BNSF Railway.
21    Q. And then Exhibit Number 5 is a document
22 entitled General Track Bulletin for December 17th, two
23 thousand and -- or December 18th, 2017; is that
24 correct?
25    A. Correct.

Page 127

1     Q. And is that an Amtrak-generated document?
2     A. No, it is not.
3     Q. Who generates that document?
4     A. Burlington Northern Santa Fe.
5     Q. Then Exhibit Number 6 is the timetable,
6  Timetable Number 2 for Sounder Commuter Rail; is that
7  correct?
8     A. Yes.
9     Q. And who generates that document?
10    A. Sound Transit.
11    Q. At various times during your testimony on
12 direct you were referred to, quote, the railroad.
13        Were you referring to the host railroad?
14    A. Yes.
15    Q. And that would be the railroad that owns and
16 operates the trackage?
17    A. Yes.
18    Q. In this case, on this section of trackage, the
19 Point Defiance Bypass, that would be Sound Transit,
20 correct?
21    A. Yes.
22    Q. If you look at Page 2 of this timetable,
23 there's a section that refers to speed and permanent
24 restrictions; do you see that?
25    A. Yes.

Page 128

1     Q. At various times in the questioning from
2  Mr. Driscoll and your testimony on direct, there was a
3  reference to the 19.8 curve.
4        To be technically correct, I guess we'd be
5  referring to the curve at Milepost 19.8; is that --
6  would that be fair?
7     A. Correct. Yes.
8     Q. Okay. So when you're talking about the curve
9  where this derailment occurred, that was the curve that
10 started at Milepost 19.8, correct?
11    A. Yes.
12    Q. If you look at that section on speed --
13 permanent speed restrictions, there's a section there
14 that says milepo -- for southbound trains there's a
15 section that says Milepost 19.8 to Milepost 19.9, and
16 it's got 30.
17        Would that be 30 miles per hour?
18    A. Correct, yes.
19    Q. For Talgo trains, correct?
20    A. Yes.
21    Q. And this train that was -- Train 501 was a
22 Talgo train, correct?
23    A. Yes.
24    Q. And it's also got a 30-mile-per-hour reference
25 to passenger trains, correct?

Page 129

1     A. Yes.
2     Q. So the speed restriction that was in place at
3  Milepost 19.8 was contained within this timetable,
4  correct?
5     A. Yes.
6     Q. This would be a timetable that the engineers
7  and the crew members had on December 17th -- December
8  18th, 2017?
9     A. Yes. They're required to carry it.
10    Q. And they're required to comply with it,
11 correct?
12    A. Yes.
13    Q. Per Amtrak's guidelines?
14    A. Yes.
15    Q. And in terms of your training for the training
16 that was given to crew members with regard to this
17 section of trackage, and specifically the presence of
18 this curve, there was instruction regarding this curve
19 and this speed restriction at Milepost 19.8, correct?
20    A. There was noted in the timetable. Yes.
21    Q. And they referred to that during their
22 training, correct?
23    A. Yes.
24    Q. And they had familiarization trips, multiple
25 familiarization trips through that area, correct?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

Page 130

1   A. Yes.
2       MR. DRISCOLL: Objection; foundation.
3   Q. (BY MR. WACKERBARTH) At least with regard to
4   the conductor training that you conducted?
5   A. Yes. I didn't train them but was there.
6   Q. You were on the routes?
7   A. Yes.
8   Q. You were on the training trips?
9   A. Yes.
10  Q. Some of them.
11      Was this section of trackage in compliance
12  with the FAST Act?
13  A. Yes, it was.
14  Q. And how so?
15      MR. DRISCOLL: Objection; form,
16  foundation. Objection; form, foundation.
17  A. There was an advance speed board prior to --
18  approximately two miles prior to the speed -- the
19  reduction in speed requirement there for 30.
20  Q. (BY MR. WACKERBARTH) Did that advance speed
21  restriction sign inform the operating crew members of
22  the 30-mile-per-hour restriction at Milepost 19.8?
23  A. Yes.
24      MR. DRISCOLL: Objection; form and
25  foundation.

Page 131

1   Q. (BY MR. WACKERBARTH) And you've had some
2   testimony about Amtrak's compliance with the FAST Act,
3   and as I understand your testimony, it had to do with
4   the fact that this particular speed restriction had not
5   yet made it into Amtrak's general order; is that
6   correct?
7   A. Yes.
8   Q. Was the intent to put it into that general
9   order at some play -- at some point?
10      MR. DRISCOLL: Objection; form
11  foundation.
12  A. Yes.
13  Q. (BY MR. WACKERBARTH) And when service resumes
14  at this location, I take it it will be within that
15  general order?
16  A. Yes.
17  Q. You were also asked some questions about PTC
18  or Positive Train Control; is that correct?
19  A. Yes.
20  Q. Were you aware as to what date Congress
21  mandated Positive Train Control to be in effect?
22  A. Yes.
23  Q. Was that December 31st, 2018?
24  A. Yes.
25  Q. And this incident occurred December 17th -- or

Page 132

1   December 18th, 2017?
2   A. Yeah.
3   Q. You were also asked some questions about the
4   Amtrak general orders and the involvement of corporate
5   in those general orders.
6       And as I understand your testimony, corporate
7   can generate a systemwide general order, but do they
8   generate the sections of that order that deal with
9   local speed restrictions such as the one at Milepost
10  19.8?
11      MR. DRISCOLL: Objection; form,
12  foundation.
13  A. No.
14  Q. (BY MR. WACKERBARTH) Is that something that
15  the local division or subdivision would input into that
16  general order?
17  A. Yes.
18      MR. WACKERBARTH: I don't have anything
19  further. Thank you, Mr. Greenwell.
20      MR. DRISCOLL: I have some follow up,
21  Mr. Greenwell.
22
23          FURTHER EXAMINATION
24  BY MR. DRISCOLL:
25  Q. Mr. Greenwell, you were asked some questions

Page 133

1   regarding the general orders of Amtrak.
2       Do you recall that?
3   A. Yes.
4   Q. Did General Orders 2017-S07 apply to the
5   Amtrak crew operating on the Point Defiance Bypass?
6   A. I -- yes, it would have.
7   Q. Okay. Did General Order 2017-08 apply to the
8   crew that was operating on the Point Defiance?
9   A. I don't recall what 2017-08 was.
10  Q. Did General Order 2017-09 apply to the crew
11  operating on the Point?
12      MR. WACKERBARTH: I'll just object to
13  the form.
14  A. I -- I would have to look at the general order
15  in order to know whether or not it was still in effect
16  at the time and not canceled by another general order.
17  Q. (BY MR. DRISCOLL) How about general order
18  2017-10?
19      MR. WACKERBARTH: Same objection.
20  A. Again, same.
21  Q. (BY MR. DRISCOLL) How about general order
22  2017-11?
23  A. It would -- again, I'd have to see the general
24  orders to see which general order was -- were still in
25  effect.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

Page 134

1    Q.  And none of the general orders that were in
2  effect to the best of your knowledge and understanding
3  for the Point Defiance Bypass included Milepost 19.8
4  needed to comply with the FAST Act, true?
5              MR. WACKERBARTH:  Object to the form.
6    A.  True.
7    Q.  (BY MR. DRISCOLL)  Okay.  And Amtrak as a
8  servicing railroad has to comply with the FAST Act to
9  the best of your knowledge and understanding, true?
10             MR. WACKERBARTH:  Object to the form.
11 Calls for a legal conclusion, and it's been asked and
12 answered.
13   A.  Amtrak complied by way of the speed board
14 posted by Sound Transit, the advance speed board posted
15 by Sound Transit.
16   Q.  (BY MR. DRISCOLL)  Is it your testimony here
17 that Amtrak can rely on a host railroad to comply with
18 the FAST Act?
19             MR. WACKERBARTH:  Object to the form.
20   A.  If the host railroad has complied with it,
21 yes.
22   Q.  (BY MR. DRISCOLL)  Well, to comply with the
23 FAST Act, doesn't the conductor have to inform the
24 engineer of that post, that speed warning?
25             MR. WACKERBARTH:  Object to the form.

Page 135

1  Calls for a legal conclusion.
2    A.  If the railroad has complied by way of posting
3  the advance notice.
4    Q.  (BY MR. DRISCOLL)  Okay.  Amtrak's a railroad,
5  right?
6              MR. WACKERBARTH:  Object.
7    A.  Correct.
8    Q.  (BY MR. DRISCOLL)  So Amtrak, since you are
9  the assistant superintendent, to the best of your
10 understanding and knowledge, Amtrak, separate and apart
11 from the host railroad, has to comply with the FAST
12 Act, true?
13             MR. WACKERBARTH:  Objection.  Calls for
14 a legal conclusion.  It's been asked and answered.
15   A.  In as far as the FAST Act states.  It would
16 depend on the circumstance.
17   Q.  (BY MR. DRISCOLL)  Okay.  So did you provide
18 training to the conductors to call out to warn the
19 engineer of the sign?
20             MR. WACKERBARTH:  Objection.  Lacks
21 foundation.
22   A.  I did not.
23   Q.  (BY MR. DRISCOLL)  Okay.  So you didn't
24 provide training to the conductors to comply with the
25 FAST Act to give a verbal warning to the engineer of an

Page 136

1  upcoming permanent speed restriction, true?
2              MR. WACKERBARTH:  Object to the form.
3    A.  I myself?
4              MR. DRISCOLL:  Yeah.
5    A.  That's why I say I, myself, was not there.
6    Q.  (BY MR. DRISCOLL)  Okay.  Did you train any of
7  the conductors here and qualify them?
8    A.  No.
9    Q.  Are you aware of anyone who trained or
10 qualified any of these conductors that specifically
11 identified and told the conductors to call out the
12 permanent speed restriction and inform the engineer
13 verbally?
14   A.  I am not familiar.
15   Q.  The fact that there is a speed warning sign
16 two miles before Milepost 19.8, that would be at 17.8,
17 that does not release Amtrak and its employees of its
18 responsibility under the FAST Act, true?
19             MR. WACKERBARTH:  Object to the form.
20 Calls for a legal conclusion, and it's argumentative.
21   A.  I would be speculating if I said that was --
22 that that was true.
23   Q.  (BY MR. DRISCOLL)  Okay.  So you can testify
24 on cross that because the sign is there you've complied
25 with the FAST Act, but you can't tell me whether or not

Page 137

1  if they're trained to do the verbal call-out, whether
2  or not Amtrak is supposed to comply with the FAST Act?
3              Is that what you're saying under oath here
4  today?
5              MR. WACKERBARTH:  Object to the form.
6  It's argumentative.
7    A.  Telling you that Amtrak was in compliance by
8  way of the host railroad having the speed board on
9  there.
10   Q.  (BY MR. DRISCOLL)  Who told you that Amtrak
11 was in compliance with the FAST Act by having the speed
12 board at Milepost 17.8?
13             MR. WACKERBARTH:  Object to the form.
14 It assumes facts not in evidence.
15   A.  I can't recall.
16   Q.  (BY MR. DRISCOLL)  Who told you, sir, that
17 Amtrak was in compliance with the FAST Act for having a
18 speed board at Milepost 17.8?
19             MR. WACKERBARTH:  Object to the form.
20 Mischaracterizes the evidence.  Lacks foundation.
21 Argumentative.  Asked and answered.
22   A.  I do not -- I do not know.  I do not recall.
23   Q.  (BY MR. DRISCOLL)  What documentation have you
24 read that informs you that Amtrak complied with the
25 FAST Act by having a warning board at 17.8?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com