# EXHIBIT 20

JIM BLAIR                                          June 12, 2019

1              UNITED STATES DISTRICT COURT

2       FOR THE WESTERN DISTRICT OF WASHINGTON AT TACOMA

3     - - - - - - - - - - - - - - - - - -x

4     DALE SKYLLINGSTAD, individually,

5                       Plaintiff,

6          vs.                     2:18-cv-00648-BHS

7     NATIONAL RAILROAD PASSENGER
      CORPORATION d/b/a AMTRAK,
8
                          Defendant.
9

10    - - - - - - - - - - - - - - - - - -x

11

12            Videotaped deposition of JIM BLAIR, taken

13    pursuant to Notice, was held at the Law Offices of

14    LANDMAN CORSI BALLAINE & FORD, P.C., One Penn Center,

15    1617 John F. Kennedy Boulevard, Philadelphia,

16    Pennsylvania, commencing June 12, 2019, at 1:03 p.m., on

17    the above date, before Amanda McCredo, a Court Reporter

18    and Notary Public in the Commonwealth of Pennsylvania.

19

20

21

22

23

24

JIM BLAIR                                          June 12, 2019

```
 1   A P P E A R A N C E S:

 2   CLIFFORD LAW OFFICES
     120 North LaSalle Street
 3   31st Floor
     Chicago, Illinois 60602
 4   BY: KRISTOFER S. RIDDLE, ESQ.
     ksr@cliffordlaw.com
 5   (312)899-9090
     Attorneys for Plaintiff
 6


 7

 8   LANDMAN CORSI BALLAINE & FORD, P.C.
     120 Broadway, 13th Floor
 9   New York, New York 10271
     BY: MARK S. LANDMAN, ESQ.
10   mlandman@lcbf.com
     (212)238-4800
11   Attorneys for Defendant

12

13

14

15   ALSO PRESENT:

16   Daniel Burke - videographer

17

18

19

20

21

22

23

24
```

JIM BLAIR                                              June 12, 2019

Page 3

1                          I N D E X

2     WITNESS               EXAMINATION BY              PAGE

3     Jim Blair             Mr. Riddle                    5

4                           Mr. Landman                  72

5

6                          EXHIBITS

7     EXHIBIT                                           PAGE

8     Blair 28     NTSB Interview Transcript - Host      24
                   Railroads Group - Amtrak
9
      Blair 29     Operating Agreement Between           26
10                 National Railroad Passenger
                   Corporation and Central Puget
11                 Sound Regional Transit Authority
                   dated January 1, 2015
12
      Blair 30     Amtrak Host Railroad Relationship     67
13

14

15               PREVIOUSLY MARKED EXHIBITS

16    EXHIBIT                                           PAGE

17    Presely 14                                          60

18    Greenwell 2                                         61

19    Greenwell 3                                         62

20    Reaves 21                                           62

21    Greenwell 6                                         71

22

23

24

JIM BLAIR                                          June 12, 2019

Page 62
                          J. Blair
 1   correct?

 2            MR. LANDMAN:  Object to the form.

 3       A    Having policies, yes.

 4       Q    And maintaining those policies?

 5       A    And maintaining those policies, yes.

 6       Q    I'm going to hand you here Greenwell

 7   Exhibit 3.

 8                     (Exhibit Greenwell 3 was shown

 9                      to the witness.)

10       Q    Have you ever seen that document before?

11       A    No.

12       Q    I'll hand you here what we've previously

13   marked as Reaves Exhibit 21.

14                     (Exhibit Reaves 21 was shown to

15                      the witness.)

16       Q    Have you ever seen this document before?

17       A    No.

18       Q    You can set that aside.

19            Forgive me if we talked about this earlier,

20   but when did you first begin the negotiations of the

21   Host Railroad Agreement that is Exhibit 29?

22       A    I believe about 12 to 18 months prior to

23   its execution.

24       Q    So you were aware that Amtrak was going to

JIM BLAIR                                          June 12, 2019

                           J. Blair
1    be beginning revenue service on the Lakewood sub,

2    correct?

3         A    Yes.

4         Q    Okay.  And to your knowledge, then, was the

5    general counsel of Amtrak aware that Amtrak was

6    going to be beginning revenue service on the

7    Lakewood sub?

8              MR. LANDMAN:  Object to the form.

9         A    I don't know when she might have been

10   advised of that.

11        Q    It's your understanding that a copy of the

12   final operating agreement between Amtrak and Sound

13   Transit dated January 1st, 2015 was likely

14   circulated to general counsel, correct?

15             MR. LANDMAN:  Object to form.

16        A    Yes.

17        Q    And do you believe that having received

18   that document would indicate to somebody that Amtrak

19   would be beginning revenue service on the Lakewood

20   sub?

21             MR. LANDMAN:  Object to the form.  Calls

22        for speculation.

23        A    The receipt of the document wouldn't

24   necessarily mean that service was going to start

# EXHIBIT 21

| | |
|---|---|
| **From:** | /o=exchangelabs/ou=exchange administrative group (fydibohf23spdlt)/cn=recipients /cn=b8cf86e2ef5c420ab350c33c51751ff4-laird, kurt |
| **To:** | Trombecky, Lee |
| **CC:** | Hull, George J |
| **Sent:** | 11/2/2017 1:17:53 PM |
| **Subject:** | RE: FRA Docket No. 1999-6404 |

WSDOT is concerned

**From:** Trombecky, Lee
**Sent:** Thursday, November 02, 2017 1:13 PM
**To:** Laird, Kurt <Lairdkurt@Amtrak.com>
**Cc:** Hull, George J <HullGJ@amtrak.com>
**Subject:** RE: FRA Docket No. 1999-6404

I will ask again but I know they can't answer us as this approval or denial is being approved by the Safety Board. Then the letter needs to be written, reviewed, Edited ,Sighed and then set to us. Did we prove a good safety case? Did we do a review of the Freight service on the same tracks these are the things they are reviewing I'm sure.

Lee Trombecky
Sr.Manager Quality & Compliance
Regulatory Compliance
675 Broadway
Rensselaer NY 12144
Tel 518 462-7826
Cell 518 817-0265
Fax 518 462-5762
Email trombel@amtrak.com


*America's Railroad*

*This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.*

**From:** Laird, Kurt
**Sent:** Thursday, November 02, 2017 4:07 PM
**To:** Trombecky, Lee <TrombeL@amtrak.com>
**Cc:** Hull, George J <HullGJ@amtrak.com>
**Subject:** RE: FRA Docket No. 1999-6404

Lee as you may be aware service is due to start on Dec 18.  Who can we talk to at FRA for a temporary or permanent approval?  Should we have a call with the FRA, Amtrak and WSDOT?

**From:** Trombecky, Lee
**Sent:** Tuesday, October 24, 2017 10:22 AM
**To:** Laird, Kurt <Lairdkurt@Amtrak.com>
**Subject:** RE: FRA Docket No. 1999-6404

Kurt

Confidential Pursuant to Protective Order Dated December 12, 2018

A Docket letter has to go through the safety board. These types of letters take months. I will keep you posted.

Lee Trombecky
Sr.Manager Quality & Compliance
Regulatory Compliance
675 Broadway
Rensselaer NY 12144
Tel 518 462-7826
Cell 518 817-0265
Fax 518 462-5762
Email trombel@amtrak.com


*America's Railroad*

***This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.***

**From:** Laird, Kurt
**Sent:** Tuesday, October 24, 2017 1:13 PM
**To:** Trombecky, Lee <TrombeL@amtrak.com>
**Subject:** FW: FRA Docket No. 1999-6404

Have we heard anything back from the FRA?

**From:** Hull, George J
**Sent:** Wednesday, September 06, 2017 11:10 AM
**To:** Bergeron, Mario <BergerM@amtrak.com>; Laird, Kurt <Lairdkurt@Amtrak.com>
**Cc:** Paul, Joseph Frederick <Joseph.Paul@amtrak.com>; Trombecky, Lee <TrombeL@amtrak.com>; Banc, Stefan <banc3520@amtrak.com>
**Subject:** FW: FRA Docket No. 1999-6404

Kurt,
Please see attachments and let me know if you have any questions. I apologize for the delay in moving this forward I dropped the ball on this one.

Lee,
Thank you for progressing this quickly.

R<
George

**From:** Trombecky, Lee
**Sent:** Wednesday, September 06, 2017 1:47 PM
**To:** Hull, George J <HullGJ@amtrak.com>; Bagosy, Mark <BagosyM@amtrak.com>; Krause, Tammy <KrauseT@amtrak.com>
**Cc:** Bianchino, Lawrence <Larry.Bianchino@amtrak.com>
**Subject:** FW: FRA Docket No. 1999-6404

Please see attached letter and info sent to the FRA for the Lakewood sub.

Larry

Confidential Pursuant to Protective Order Dated December 12, 2018

Please file in Paradigm for our records.

Lee Trombecky
Sr.Manager Quality & Compliance
Regulatory Compliance
675 Broadway
Rensselaer NY 12144
Tel 518 462-7826
Cell 518 817-0265
Fax 518 462-5762
Email trombel@amtrak.com



*America's Railroad*

*This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.*

Confidential Pursuant to Protective Order Dated December 12, 2018

| **From:** | Laird, Kurt |
|---|---|
| **To:** | Olson, Gay Banks; Greenwell, Jeffrey; Ward, Jeff; Smith, Ashley D; Meeds, Clint; Valley, Dan; Bannish, Gregory; Kukec, John; Bradasich, Christopher; Beatson, Charles; Facteau, Kimberly; Thompson, Joshua T; Presley, Raymond D |
| **Sent:** | 9/29/2017 8:54:10 AM |
| **Subject:** | FW: Cascades approved for December 18, 2017 |
| **Attachments:** | cascades1217.xls |

New service being entered in ARROW.

**From:** Azen, Michael
**Sent:** Friday, September 29, 2017 8:32 AM
**To:** Garafola, Peter <Peter.Garafola@amtrak.com>
**Cc:** Van Sant, Bruce <VANSANB@amtrak.com>; Davidson, Bruce <DavidsB@amtrak.com>; Laird, Kurt <Lairdkurt@Amtrak.com>
**Subject:** Cascades approved for December 18, 2017

Pete,

Attached are fully approved Cascade trains.  Okay to load into arrow
**Michael Azen**
Manager of Scheduling
Amtrak | 500 W. Jackson Blvd | Second Floor | Chicago, IL 60661
Email: Michael.Azen@amtrak.com | office: 312.544.5331 | cell: 312.914.5063 | fax:202.799.6093



| | |
|---|---|
| **From:** | Laird, Kurt |
| **To:** | Greenwell, Jeffrey |
| **Sent:** | 12/4/2017 2:33:53 PM |
| **Subject:** | RE: Schedule Change Notice- Cascades Service Effective December 18, 2017 |

The word doc is incorrect.  Michael knows.

**From:** Greenwell, Jeffrey
**Sent:** Monday, December 04, 2017 2:30 PM
**To:** Facteau, Kimberly <Kimberly.Facteau@amtrak.com>; Beatson, Charles <BeatsoC@amtrak.com>; Presley, Raymond D <Raymond.Presley@amtrak.com>; Bradasich, Christopher <Christopher.Bradasich@amtrak.com>; Thompson, Joshua T <Joshua.Thompson@amtrak.com>; Opolka, Robert <Robert.Opolka@amtrak.com>; Meeds, Clint <Clint.Meeds@amtrak.com>; Jacobs, John <JacobsJo@Amtrak.com>; Robideaux, Cory <Cory.Robideaux@amtrak.com>; Keltner, Keith <KeltneK@amtrak.com>; Bannish, Gregory <Gregory.Bannish@amtrak.com>; Valley, Dan <Vall3724@amtrak.com>
**Cc:** Laird, Kurt <Lairdkurt@Amtrak.com>; Ward, Jeff <WardJe@amtrak.com>; Olson, Gay Banks <OlsonG@amtrak.com>; Smith, Ashley D <Ashley.Smith@amtrak.com>; Williams, Richard L <Richard.Williams.2@amtrak.com>
**Subject:** Fwd: Schedule Change Notice- Cascades Service Effective December 18, 2017

Please see the attached information regarding the December 18th Cascade schedule change.


Sent from my Verizon, Samsung Galaxy smartphone


-------- Original message --------
From: "Weaver, Michael S" <Michael.Azen@amtrak.com>
Date: 12/4/17 11:50 AM (GMT-08:00)
To:
Subject: Schedule Change Notice- Cascades Service Effective December 18, 2017

Please see attached information regarding the Cascades schedule change effective December 18, 2017.  Please insure all personnel needed to support this change are informed.

**Michael Azen Weaver**
Manager of Scheduling
Amtrak | 500 W. Jackson Blvd | Second Floor | Chicago, IL 60661
Email: Michael.Azen@amtrak.com | office: 312.544.5331 | cell: 312.914.5063 | fax:202.799.6093



Confidential Pursuant to Protective Order Dated December 12, 2018

| | |
|---|---|
| **From:** | Azen, Michael |
| **To:** | Josephine Jordan |
| **CC:** | Blair, Jim; Davidson, Bruce; Hannah, Kerry; Keith Miller; Kim Fossland; Fox, Jay Mitchell |
| **Sent:** | 9/29/2017 9:39:48 AM |
| **Subject:** | RE: Cascades Proposed Schedule Change- Point Defiance Bypass and Extra Roundtrip |
| **Attachments:** | cascades1217.xls |

Jordan,

As discussed today the start date for the new Cascades schedule will be December 18, 2017.  See attached a skeletons with dates filled in.

Thank you

**Michael Azen**
Manager of Scheduling
Amtrak | 500 W. Jackson Blvd | Second Floor | Chicago, IL 60661
Email: Michael.Azen@amtrak.com | office: 312.544.5331 | cell: 312.914.5063 | fax:202.799.6093



**From:** Josephine Jordan [mailto:JJORDAN1@up.com]
**Sent:** Wednesday, May 31, 2017 2:31 PM
**To:** Azen, Michael <Michael.Azen@amtrak.com>
**Cc:** Bruce, Barbara <BBruce@amtrak.com>; Blair, Jim <BlairJ@amtrak.com>; Davidson, Bruce <DavidsB@amtrak.com>; Hannah, Kerry <HannahK@amtrak.com>; Keith Miller <kemiller@up.com>; Kim Fossland <KJRATCLI@UP.COM>
**Subject:** Cascades Proposed Schedule Change- Point Defiance Bypass and Extra Roundtrip

Michael,

Union Pacific approves the implementation of the schedule for trains 500, 506, 508, 512, 514, 503, 505, 507, 511, and 513 in the attached file named "cascadesTBD rev030717.xls" estimated, effective on October 1, 2017.  This approval is contingent on the execution of an AAC before the proposed implementation date that recognizes the modified schedule elements for the purposes of Appendix V, Table 1 and Appendix V, Table 2 of the Agreement between National Railroad Passenger Corporation and Union Pacific Railroad Company, January 1, 2000, as Amended. Thanks.

**The specific schedule modifications that UP approves are:**
**Summary of Proposed Schedule Time Changes Portland to Eugene - - Southbound Trains**
· AMT505 (former AMT507) - will depart same time at 1805, but has some shifts in recovery time.
· AMT511 (former AMT505) - will depart 10 minutes <u>later</u> at 0945 and operate on M-F versus Sa-Su-Ho.
· AMT513 (replaces AMT503) - will depart at 1230 and operate on Sa-Su-Ho.

**Summary of Proposed Schedule Time Changes Eugene to Portland - - Northbound Trains**
· AMT508 - will depart 30 minutes <u>later</u> from Eugene.
· AMT512 - renumbered; former AMT500.  Mon-Fri
· AMT514 - renumbered; former AMT506.  Sa-Su-Ho

Josephine Jordan | General Manager Passenger Operations | Union Pacific Railroad | 850 Jones Street - Stop HDC | Omaha, NE 68102 US (☎Office 402.636.7227(☎Cell 402.213.3821| 7:Fax 402.233.2095 |*: jjordan1@up.com

NRPC_AMTRAK_010459

# EXHIBIT 22

# New bypass route set to open near Seattle Dec. 15

By Robert W. Scott | November 9, 2017

RELATED TOPICS: WEST | PASSENGER | INFRASTRUCTURE | AMTRAK | COMMUTER

**Trains Industry Newsletter**
Get a weekly roundup of the industry news you need.                                    Sign up
By signing up you may also receive occasional reader surveys and special offers from Trains magazine. View our **privacy policy**.

SEATTLE — The end of 2017 is bringing some significant changes to rail passenger traffic on the busy Interstate 5 corridor between Portland and Seattle. After nearly a decade of studies and construction, the $181.2 million dollar Point Defiance Bypass Route will be hosting a flood of daily passenger and commuter trains south of Tacoma, Wash.



A map for the Point Defiance, Wash., bypass project.

Washington State Department of Transportation

The multi-year project will culminate with the completion of a new Amtrak depot in Tacoma at the former Milwaukee Road Freighthouse and upgrades 14.5 miles of track and right-of-way on the nearly 20-mile route between Tacoma and Nisqually, Wash., where the bypass will rejoin the mainline to Portland, Ore. Part of the upgraded route still retains the original 100-plus year-old alignment on the former Northern Pacific south of the Tacoma Amtrak depot where the tracks climb a steep 2.85-percent grade to South Tacoma.

Although much more scenic, the alignment along Puget Sound was beset with freight congestion, tight curvature and a single-track tunnel under Point Defiance. The stretch of track along the Sound was also subject to yearly mudslides which resulted in delays and cancellations of Amtrak service.

Amtrak is adding an additional daily Amtrak *Cascades* round-trip in the morning and the evening between Seattle and Portland bringing their total trains to 14 including the *Coast Starlight*. The daily Sounder commuter train count north of Lakewood, Wash., is 16

daily trains which will result in 30 daily passenger trains on the new single track line. The new route is slated to reduce Amtrak passenger times by 10 minutes.

Washington state officials and local dignitaries are expected to gather Dec. 15 for the dedication of the new Tacoma depot as well as the bypass route.

More information is available online.

**« Previous story**
Nashville steam supporters are 60 percent of the way toward first goal

**Next story »**
Short Line association celebrates year without fatalities on member lines

# NEWSWIRE »»»»

Previous Day                    November 09, 2017                    Next Day

- Expensive questions surface with changed passenger car order
- Safety board veteran urges action on FRA nominee
- Siemens to build next generation passenger cars
- Nashville steam supporters are 60 percent of the way toward first goal
- New bypass route set to open near Seattle Dec. 15
- Short Line association celebrates year without fatalities on member lines

# EXHIBIT 23

**From:** Spratt, Terrence J
**To:** Tuffy, Shane
**Sent:** 6/21/2016 4:58:15 AM
**Subject:** FAST Act Implementation

Shane,

Our deadline for complying with the FAST Act requirements (curve, bridge, tunnel + 20mph speed restrictions) is July 3, so we have to develop and issue instructions for all locations subject to those restrictions.  I could be wrong, but I believe Pete was involved in collecting the spreadsheets from around the system that listed the locations where that restriction applied.  Dave and I were looking to implement the same type of instructions we had to go with for the safety advisory following 188 (communication among crew members about the restrictions).

Will you have time to talk about this tomorrow?  Since we're really looking at cutting and pasting existing (past) instructions, I'd like to have something for Dave to review in a couple days.  Think that's reasonable?

Thanks,
Terry

*Terry Spratt*
*Director, Operating Practices*
*1 High Speed Way / Wilmington, DE 19801 / Office: 302-429-2412 / ATS: 739-2412 / Cell: 302-332-1709*



Confidential Pursuant to Protective Order Dated December 12, 2018

| | |
|---|---|
| **From:** | Nichols, David |
| **To:** | Tuffy, Shane |
| **Sent:** | 11/4/2016 9:23:39 AM |
| **Subject:** | FW: FAST Act Requirements fo Over 20MPH Speed Drops |
| **Attachments:** | FAST speeds.xlsx |

Dave Nichols
*VP/Chief Transportation Officer*
2955 Market Street
Philadelphia, PA 19104
(215) 349-2499

---

**From:** Chittenden, Kevin
**Sent:** Monday, March 14, 2016 2:12 PM
**To:** Nichols, David
**Cc:** DeCataldo, Michael
**Subject:** RE: FAST Act Requirements fo Over 20MPH Speed Drops

Thanks for the reminder to send… see attached.

## Kevin M. Chittenden

Deputy General Manager,
Amtrak, Empire Service

(518) 449-5950 (o)
(413) 537-6788 (m)

 *America's Railroad*

---

**From:** Nichols, David
**Sent:** Monday, March 14, 2016 1:54 PM
**To:** Bellotti, Lou; Chandler, Michael; Chittenden, Kevin; Fournier, Fred; Gordon, Shawn; Kirk, Thomas; Laird, Kurt; Savoy, Morrell; Young, Steven; Trosino, Michael; O'Mara, Paul
**Cc:** Stadtler, DJ; Arcari, Sarina; Bergeron, Mario; Bitar, Rodrigo; Black, Dan; Commer, Jay; Connolly, Tom; DeCataldo, Michael; Hall, Thomas (Customer Service); Jagodzinski, Christopher; Logue, Michael J; McDonough, Robin; Murphy, Mark; Naparstek, Scot L; Bowen, Kathleen M; Hines, Jonathan; Mruk, Edward; Spratt, Terrence J; Vilter, Paul; McKeon, Mark H; Impastato, Theresa M
**Subject:** RE: FAST Act Requirements fo Over 20MPH Speed Drops

All:

Please have all the templates complete by Friday, 3/18.

Dave Nichols
*VP/Chief Transportation Officer*
2955 Market Street
Philadelphia, PA 19104
(215) 349-2499

---

**From:** Nichols, David
**Sent:** Friday, March 04, 2016 8:37 AM
**To:** Bellotti, Lou; Chandler, Michael; Chittenden, Kevin; Fournier, Fred; Gordon, Shawn; Kirk, Thomas; Laird, Kurt; Savoy, Morrell; Young, Steven; Trosino, Michael; O'Mara, Paul

**Cc:** Stadtler, DJ; Arcari, Sarina; Bergeron, Mario; Bitar, Rodrigo; Black, Dan; Commer, Jay; Connolly, Tom; DeCataldo, Michael; Hall, Thomas (Customer Service); Jagodzinski, Christopher; Logue, Michael J; McDonough, Robin; Murphy, Mark; Naprastek, Scot L; Bowen, Kathleen M; Hines, Jonathan; Mruk, Edward; Spratt, Terrence J; Vilter, Paul; McKeon, Mark H; Impastato, Theresa M

**Subject:** FW: FAST Act Requirements fo Over 20MPH Speed Drops

All:

A reminder to forward the information required to comply with the FAST Act.

DAN

---

**From:** Nichols, David
**Sent:** Tuesday, February 16, 2016 11:01 AM
**To:** Bellotti, Lou; Chandler, Michael; Chittenden, Kevin; Fournier, Fred; Gordon, Shawn; Kirk, Thomas; Laird, Kurt; Savoy, Morrell; Young, Steven; Trosino, Michael; O'Mara, Paul
**Cc:** Stadtler, DJ; Arcari, Sarina; Bergeron, Mario; Bitar, Rodrigo; Black, Dan; Commer, Jay; Connolly, Tom; DeCataldo, Michael; Hall, Thomas (Customer Service); Jagodzinski, Christopher; Logue, Michael J; McDonough, Robin; Murphy, Mark; Naprastek, Scot L; Bowen, Kathleen M; Hines, Jonathan; Mruk, Edward; Spratt, Terrence J; Vilter, Paul; McKeon, Mark H; Impastato, Theresa M
**Subject:** FAST Act Requirements fo Over 20MPH Speed Drops

All:

Please find attached a spread sheet, with instructions for completion in one of the tabs, which must be accomplished in order to comply with the recently enacted "Passenger Rail Reform and Investment Act of 2015."

The Act requires that over 20MPH speed reductions, as shown below, be catalogued for the entire Amtrak System:

## 17 SEC. 11406. SPEED LIMIT ACTION PLANS.

(a) IN GENERAL.—Not later than 90 days after the
date of enactment of this Act, each railroad carrier pro-
viding intercity rail passenger transportation or commuter
rail passenger transportation, in consultation with any
applicable host railroad carrier, shall survey its entire system
and identify each main track location where there is a
reduction of more than 20 miles per hour from the approach
speed to a curve, bridge, or tunnel and the maximum
authorized operating speed for passenger trains at that
curve, bridge, or tunnel.

120 days after this is done, action plans must be submitted in order

.....to enable warning and enforcement of the maximum
authorized speed for passenger trains at each location
identified....

Please have PC qualified supervisors from your staffs fill in the necessary information.

Note the following:

- Only submit speed reductions greater than 20 MPH, i.e., 21 MPH and higher, coming to a curve, bridge or tunnel, there is no need to give more information than required;
- Information for Amtrak controlled territory (NEC, AML) has already been collected by the Engineering Department who will complete the sheet;
- Columns M and N are important for formulation of Amtrak's mitigation plan on host railroads, so please indicate if the restriction is on a route with a single engineer or two engineers and whether the restriction is

Confidential Pursuant to Protective Order Dated December 12, 2018

protected by signage;

- For those of you who have already submitted the speed drops, please use the new spread sheet so that we have a consistent format for our use and FRA's use, and remember, it is only drops greater than 20MPH.

Also attached is and for the use of those of you who operate on BNSF territory, is their list of speed drops for passenger trains on their territory; it may be of assistance.

If you have any questions please contact me or Terry Spratt.

Thanks for your help in this matter.

Dave


Dave Nichols
*VP/Chief Transportation Officer*
2955 Market Street
Philadelphia, PA 19104
(215) 349-2499

Confidential Pursuant to Protective Order Dated December 12, 2018

NRPC_AMTRAK_019932

# EXHIBIT 24

**From:** Miller, Nancy
**To:** Smith, Tamika; Balderston, Philip A; Laird, Kurt
**Sent:** 10/25/2017 7:57:48 AM
**Subject:** RE: WSDOT/Amtrak Letter Agreement for Pt. Defiance Bypass Testing and Special Train

Thanks. We will discuss further on the call today.

*Nancy J. Miller, CPA, CFF*
Director, Audit & Financial Control
National Railroad Passenger Corporation
30th and Market Streets | 5NW, Box 61| Philadelphia, PA 19104
Tele: 215.349.3840 | E-mail: millern@amtrak.com

**From:** Smith, Tamika
**Sent:** Wednesday, October 25, 2017 10:56 AM
**To:** Miller, Nancy <MillerN@amtrak.com>; Balderston, Philip A <Philip.Balderston@amtrak.com>; Laird, Kurt <Lairdkurt@Amtrak.com>
**Subject:** RE: WSDOT/Amtrak Letter Agreement for Pt. Defiance Bypass Testing and Special Train

Yes he did.

**From:** Miller, Nancy
**Sent:** Wednesday, October 25, 2017 7:56 AM
**To:** Smith, Tamika <Tamika.Smith@amtrak.com>; Balderston, Philip A <Philip.Balderston@amtrak.com>; Laird, Kurt <Lairdkurt@Amtrak.com>
**Subject:** RE: WSDOT/Amtrak Letter Agreement for Pt. Defiance Bypass Testing and Special Train

Is Kirk Fredrickson estimating the Amtrak costs?

*Nancy J. Miller, CPA, CFF*
Director, Audit & Financial Control
National Railroad Passenger Corporation
30th and Market Streets | 5NW, Box 61| Philadelphia, PA 19104
Tele: 215.349.3840 | E-mail: millern@amtrak.com

**From:** Smith, Tamika
**Sent:** Wednesday, October 25, 2017 10:43 AM
**To:** Miller, Nancy <MillerN@amtrak.com>; Balderston, Philip A <Philip.Balderston@amtrak.com>
**Subject:** FW: WSDOT/Amtrak Letter Agreement for Pt. Defiance Bypass Testing and Special Train

Hi Nancy and Phil,

I am scheduling a call to discuss the attached and below with Kurt Laird and Eric "Rik" Smith, are you available today at 4:30pE.T?

**From:** Fredrickson, Kirk [mailto:FredriK@wsdot.wa.gov]
**Sent:** Tuesday, October 24, 2017 2:45 PM
**To:** Smith, Tamika <Tamika.Smith@amtrak.com>
**Cc:** Laird, Kurt <Lairdkurt@Amtrak.com>; A-SRMD Document Control <SRMDDoc@WSDOT.WA.GOV>; Thompson, Brent <ThompBr@wsdot.wa.gov>; Dunster, Chris <DunsteC@wsdot.wa.gov>; Biggs, Jason R. <BiggsJR@wsdot.wa.gov>

NRPC_AMTRAK_021178

Tamika:

As we prepare for our new service start on December 18, 2017, Amtrak must qualify train crews and test all equipment types that will operate on the new Pt. Defiance Bypass rail line. In addition, WSDOT wants to offer a special event train on December 13 to carry local leaders, members of our congressional delegation, and others on the inaugural run over the new line.

Attached for your review is a draft letter agreement and the draft exhibits that accompany this letter. It borrows heavily from the letter agreement we executed with Amtrak in February 2017 for the speed and signal test on the same section of railroad.

Please share this draft letter agreement and the draft exhibits with the appropriate people on your team. We have been working with Kurt Laird on the test plan, but we need Amtrak to examine the costs estimates I generated for Exhibit 1 and make sure that my numbers are accurate and that the insurance provisions and costs are accurate as well.

Call or email at any time to discuss. This should be the last of the agreements we need to execute with Amtrak before the new service start.

Kirk Fredrickson
Cascades Passenger Services Manager
WSDOT Rail, Freight and Ports Division
310 Maple Park Ave SE, Box 47407
Olympia, WA 98504-7407
W: 360.705.7939
C: 360.890.9210

Confidential Pursuant to Protective Order Dated December 12, 2018

# EXHIBIT 25

# Amtrak Train Collision with Maintenance-of-Way Equipment
## Chester, Pennsylvania
## April 3, 2016



**Accident Report**

NTSB/RAR-17/02
PB2018-100263



**National
Transportation
Safety Board**

NTSB/RAR-17/02
PB2018-100263
Notation 57150
Adopted November 14, 2017

# Railroad Accident Report

## Amtrak Train Collision with Maintenance-of-Way Equipment
## Chester, Pennsylvania
## April 3, 2016



**National
Transportation
Safety Board**

490 L'Enfant Plaza, S.W.
Washington, D.C. 20594

**Table 3.** Speed versus distance.

| Speed (mph) | Feet per Second | Feet per 15 Seconds |
|:---:|:---:|:---:|
| 90 | 132.0 | 1,980 |
| 95 | 139.3 | 2,090 |
| 100 | 146.7 | 2,200 |
| 105 | 154.0 | 2,310 |
| 110 | 161.3 | 2,420 |

## 1.16 Safety Culture and Management

Safety culture is a term used to refer to an organization's attitudes and actions about safety. That is, the beliefs commonly held by all employees throughout a corporation about safety in their workplace, including their safety, that of their peers and colleagues, and that of customers during business activities. All organizations have a safety culture; however, safety cultures can be weak and ineffectual at fostering safe work practices by employees. Safety culture has been studied widely across business communities; organizations that prioritize safety within all business activities have a strong safety culture.

James Reason has indicated that organizations with a weak safety culture will have more active failures, as well as latent conditions that undermine safety. Active failures are the errors and violations committed by those in direct contact with the system. Latent conditions are created by system designers, builders, procedure writers, maintainers, and system managers and can lie dormant for many years before they combine with active failures and lead to an accident. (Reason 2013, pp. 82–83) Thus, one would expect employees of an organization with a weak safety culture to engage in more unsafe actions than employees of an organization with a strong safety culture. One would also expect managers of an organization with a weak safety culture to fail to seek and address upstream system factors, such as poor training and a lack of equipment. As Reason observes, perhaps the most insidious and far-reaching effects of a weak safety culture are shown by an organization's reluctance to proactively address known safety shortcomings. (Reason 2013)

An important concept related to safety culture is safety management. Generally, safe organizations have a system in place to manage safety, which is called a safety management system (SMS). The FAA, which has mandated the implementation of SMS, defines an SMS as a "formal, top-down, organization-wide approach to managing safety risk and assuring the effectiveness of safety risk controls.[34] It includes systematic procedures, practices, and policies for the management

---

[34] FAA Order 8000.369, FAA Safety Management System Initiative (FAA Safety Management System Initiative). Accessed August 15, 2017. The order applies to the Air Traffic Organization (ATO), Aviation Safety Organization (AVS), Office of Airports (ARP), Office of Commercial Space Transportation (AST), the Office of the Next Generation Air Transportation System (ANG), and the Hazardous Materials Safety Program Office in the Office of Security and Hazardous Materials Safety (ASH).

of safety risk." Further, "an SMS is a structured process that obligates organizations to manage safety with the same level of priority that other core business processes are managed." Safety culture and SMS programs are interconnected:

> A safety culture is the manifestation of the internalization of the SMS on the part of the employees that make up the organization. The SMS should take account of and shape the safety culture of the organization. Effective SMS instill and reinforce a safety culture among employees, and that safety culture ensures the effective implementation of the policies, principles, and practices set forth by the management system.[35]

SMS programs have four functional characteristics:

- Corporate policies and procedures for safety and safe operations. All SMS programs must define policies, procedures, and organizational structures to accomplish their goals. The policies and procedures must emanate from the top of the organization with clear support and expectations for compliance throughout all lower corporate levels. The corporate policies and procedures must align and implement senior management's vision for safety throughout the business operations.

- Safety assurance controls that serve as checks and balances for the implementation of safety policies and practices and also as a feedback mechanism to inform management about the effectiveness of the safety programs. These controls must be applied continuously and respected throughout the organization's operations, and employees must be encouraged to respect and work with the controls, even in changing work environments.

- Risk management is a formal system of hazard identification, analysis, and mitigation. It is an essential component of work project planning, and it should be performed for each job and for all work crews working in or for the corporation. Risk management techniques vary and, therefore, can be tailored to fit all jobs. The purpose of risk management is to inform workers about safety hazards and to provide sufficient insights to control risks to acceptable levels.

- Safety promotion. The safety policies, practices, and techniques of a safety culture will not influence the actions and decision-making of workers without management's guidance and support of compliance. The purpose of safety promotion is to convey to all workers that safety is a core value of the organization, which has established practices that support safety and in which management participates.

---

[35] 2011. Implementing Safety Management System Principles in Rail Transit Agencies (https://www.transit.dot.gov/regulations-and-guidance/safety/safety-management-systems-sms). Accessed August 22, 2017.

### 1.16.1 Amtrak Safety Management

NTSB investigators examined the first-line safety supervision at the Chester work site in relation to the unsafe practices found, which led to interviews with senior management personnel to learn about and understand Amtrak's safety program and safety management and how they affect roadway workers and train-operating employees. Investigators also interviewed senior managers of the unions that represented the roadway workers involved in the accident. The interviews included safety policies, procedures, and assurances; the collection of safety-critical information; risk management strategies; and promotion. Additional safety topics discussed include safety oversight, corporate safety knowledge and vision, and reliance on rule compliance.

At the time of the accident, Amtrak had a system safety program (SSP) in place. Amtrak's SSPP defines "system safety," as follows:

> Amtrak defines system safety as a detailed method of applying scientific, technical, operating, and management techniques and principles for the timely identification of hazard risk and initiation of actions to prevent or control these hazards throughout the system life cycle and within the constraints of operational effectiveness, time, and cost. The system to which the SSP applies is Amtrak and all of its organizational and physical components, people, procedures, facilities, and equipment.

The Amtrak safety policy contained in the SSPP states the following:

> To be safer, Amtrak will use behavioral safety principles in developing and implementing safety risk reduction programs. The Safe-2-Safer Program and the SSPP will guide prevention efforts by identifying the policies, programs, and strategies that promote a safe work environment for employees and travelers alike. Safety principles are used to integrate safety into all phases of our business including design, construction, modification and rehabilitation, operation, maintenance, and procurement, and that we reduce risk and eliminate, to the extent possible, potentially hazardous activities and conditions.

> Amtrak's safety and occupational health goals can be achieved through a responsive, coordinated safety and risk management effort using the Safe-2-Safer process. We commit to:

> - Working with all employees to identify safety risks ….

According to Amtrak's deputy chief safety officer, the SSPP was initiated in 2006 and "was developed in accordance with the American Public Transportation Association standards, which are volunteer consensus elements."[36] In general, Amtrak's SMS programs, including the implementation of the strategies described in the SSPP, were described as "evolving." In addition

---

[36] There is no federal requirement for Amtrak to have an SSPP.

to the Safe-2-Safer Program, Amtrak had enacted two other safety programs: a close call reporting system and the Safety Liaison Program.

Safe-2-Safer was a peer-to-peer program intended to drive behavior-based safety. The program relied on employees to provide feedback to their peers to encourage them to engage in safer behaviors. Amtrak's management intended Safe-2-Safer to be a nonthreatening and confidential program for collecting safety-related information.

Amtrak adopted the FRA's Confidential Close-Call Reporting System—C³RS—and anticipated collecting safety-critical information through it.[37] The FRA C³RS website provides this description of the system:

> A[n] FRA sponsored voluntary confidential program allowing railroad carriers and their employees to report close calls. The program provides a safe environment for employees to report unsafe events and conditions. Employees receive protection from discipline and FRA enforcement. Railroads also receive protection from FRA enforcement for events reported within C³RS.

The Safety Liaison Program relied on experienced labor personnel to visit work sites randomly to assess the safety of work activities. The safety liaisons were Amtrak employees who were given the authority to challenge workers when they observed unsafe acts and who were expected to counsel workers on proper, safe work techniques. Amtrak's Safety Division managers told NTSB investigators that because the safety liaisons were experienced in their trades, the workers likely would respect and accept their safety advice more readily than they would if the same advice were formalized in rules. However, Amtrak safety managers said that the Safety Liaison Program started about 3 1/2 years ago, was understaffed, and at the time of the accident many of its tools and procedures for observing and tracking safety issues had not been implemented throughout the company. NTSB investigators determined that no safety liaisons were present at the work site on the day of the accident.

Investigators also learned that all the unions that represented the roadway workers involved in the accident had opted out of Amtrak's Safe-2-Safer program and the C³RS program during their respective labor-management contract negotiations. The union representatives told investigators that the work environment was hostile and made it difficult for workers to perform their jobs safely and to provide peer-to-peer protection for their colleagues, because Amtrak had instituted a "Cardinal Rules" program that could lead to workers' being fired for a single violation. (See figure 12.)

---

[37] FRA C³RS website (http://www.fra.dot.gov/c3rs). Accessed September 25, 2017.



**Figure 12.** Amtrak's 10 Cardinal Rules.

The general chairman of the Brotherhood of Maintenance of Way Employes Division (BMWED) expressed frustration with Amtrak's Cardinal Rules, which he suggested led to employees' being terminated for minor violations. He said—

> I can think of 8 or 10 people right now that were fired for minor violations of RWP rules, that probably, in my opinion, should not have been fired. … one guy was fired because he got out of a truck on a, basically a dead track, where the grass is this high, and [he] didn't get RWP protection. A train hasn't been on that track for 25 years.

The BMWED general chairman added that the fear of being fired "sends terror into every man's thought and family, when you're without that income…." The BMWED general chairman indicated that the revocation of an existing close-call policy, and the implementation of the Cardinal Rules, resulted in vital safety information not being reported. He said that "engineers were reluctant sometimes to report close calls with track gangs, because they didn't want to involve the track gang in discipline."

Other union leaders expressed similar concerns. For instance, the general chairman of the Brotherhood of Railroad Signalmen (BRS) described a culture of fear at Amtrak: "There's no dialogue … it's fear. I mean you talk to the managers, they're afraid. And you can talk to the youngest guy. It's fear." The BRS chairman expressed concern that Amtrak threatened to fire employees for not following fall protection protocol, but failed to provide the necessary policy and resources to follow the protocol.

A representative for the American Railway and Airway Supervisors Association (ARASA) union indicated that Safe-2-Safer was "nothing but a program that drove down safety statistics," and that "nobody believed in the program, but if you spoke against [it], especially managers, they were deathly afraid to say anything because their superiors would take action against them." He said, "This company is driven by fear." The ARASA representative indicated that there were situations in which employees "reported track conditions that there should have been speed restrictions on, they were pressured into either overlooking it, or changing their reports."

The ARASA representative also expressed concern over training, saying, "we have no training other than the Safe-2-Safer Program, that was basically pushed on us, and then never followed through." He indicated that the classroom training was insufficient, and that the instructors lacked experience and could not effectively elaborate on classroom materials. He voiced concern that feedback from the field was not being incorporated into classroom training appropriately. The BMWE chairman also expressed concern over the training, indicating that the training instructors at one point were teaching an incorrect way to use SSDs.

Investigators reviewed Amtrak records pertaining to the Cardinal Rules to evaluate the extent to which the union representatives' concerns were consistent with objective data. Amtrak records indicated that the Cardinal Rules were enforced across the entire Amtrak system. In 2016, employees had been terminated in Berlin, Connecticut; Chicago; New York; Denver; Philadelphia; Wilmington, Delaware; and Newark, New Jersey. Investigators confirmed that multiple employees had been terminated for failing to establish RWP. In addition, Amtrak had considered terminating

an employee for failing to use fall protection but decided not to because the "employee [was] not trained on fall protection, and did not understand [the] requirements."

Investigators spoke with Amtrak management to obtain additional information about the Cardinal Rules. Amtrak's chief operations officer indicated that "every single Cardinal Rule violation goes to a group that looks at the mitigating circumstances, and that group decides what the discipline is going to be, and there's a progressive discipline process." The chief operations officer later added that "The perception is, wrongfully so, and I think communication, again, could have been better, that you violate one of these rules, you're terminated. Nothing could be further from the truth."

Additionally, the chief safety officer provided information about the enforcement of the Cardinal Rules, indicating that the repercussions an employee experienced for violating a Cardinal Rule varied depending on who discovered the violation. That is, if a safety liaison discovered a Cardinal Rule violation, the employee would be counseled, but not reprimanded. However, if a supervisor discovered a Cardinal Rule violation, the incident would be reported to management, who would review the violation and consider termination of the employee.

Amtrak's chief operating officer did not acknowledge the unions' concerns with the Cardinal Rules and said that he did not understand their position. The disagreement between Amtrak and its unions over Amtrak's safety programs became a labor-management contract negotiating issue, putting roadway workers at risk every day. Amtrak acknowledged an awareness of the unions' refusal to participate in its Safe-2-Safer and close-call reporting programs yet continued to conduct its public transportation business without openly disclosing and proactively promoting resolutions to these safety shortcomings.

Investigators interviewed Amtrak senior executives and division heads to further examine safety management practices and efforts to improve safety management throughout the company. The managers had a variety of attitudes about best safety practices. Some managers showed little interest or concern about safety beyond the demands of their immediate job responsibilities, others expressed awareness of safety principles but lacked detailed knowledge of them or experience in applying them, and a few managers enthusiastically espoused their use of well-established and contemporary safety management techniques in performing their jobs.

In particular, there appeared to be a gap in Amtrak's safety training. The Amtrak director of training indicated that there was no field auditing process to evaluate the effectiveness of the classroom training that Amtrak foremen received. Thus, Amtrak could confirm that the workers involved in the accident had probably viewed a presentation pertaining to the use of SSDs. However, Amtrak could not confirm whether this presentation had sufficiently prepared the workers to consistently apply the safety devices in the field. Also, the director of operating practices recognized the fallibility of human performance (that is, humans do not perform error free 100 percent of the time) yet failed to acknowledge the inherent risks associated with train dispatchers initiating passenger train movements based solely on verbal communications that tracks are clear. He would not accept a proposal that train dispatchers can trust the safety-critical information communicated by track foremen, but they must verify that information through follow-up questions. Instead, he strongly relied on old railroad industry adages, such as foremen

must follow the rules (report only when tracks are clear), and train dispatchers do not need to slow passenger trains through construction zones because there is no rule that requires it.

The senior manager of heavy construction (production programs) demonstrated his awareness and knowledge of safety practices by requiring his staff to prepare detailed SSWPs. The chief operating officer and the deputy chief safety officer were able to discuss system safety concepts in detail and conveyed clear visions to improve Amtrak's safety culture through contemporary system safety strategies.

Although the Amtrak managers had disparate views of safety management, they shared one common perspective: workers must follow the rules to remain safe. This was evident in interviews with employees throughout all levels of Amtrak's management. Amtrak's reliance on rule compliance, for instance, was highlighted in an interview with Amtrak's chief safety officer pertaining to construction zones:

Question:   Do construction zones present any unique challenges from your point of view as chief safety officer?

Answer:   Not if you follow the rules. You follow the rules, you follow the procedures out there. The rules, there are rules in place that allow the safe passage of trains. It's when you don't follow the rules that you get yourself in trouble. Obviously, Amtrak is a high-speed railroad, if you will. They do a lot of their work at nighttime. But nonetheless, if you follow the rules and procedures, I don't see it as much of an issue.

A second example of Amtrak's reliance on rule compliance is evident in a discussion with Amtrak's director of operating practices:

Question:   We know rules probably can't be written to cover every scenario that's experienced out on the road. We know that people can't be relied upon as 100 percent rule followers. Is there a take-away from that that may help Amtrak make some improvements beyond what the NTSB recommends?

Answer:    I would take exception to your statement that we can't depend on people to be 100 percent rule followers. Every employee's life depends on each and every other employee following the rules. As soon as one employee fails to follow the rules, it puts another employee or the riding public in jeopardy and that's unacceptable.

Many similar conversations unfolded as investigators spoke with Amtrak managers about their approach to managing safety.[38] The NTSB recognizes that rules and procedures are an essential element of transportation operations. Rules can be viewed as a 'soft' safety defense. James Reason (1997, p. 8) stated the following:

'Soft' defenses, as the term applies rely heavily upon a combination of paper and people: legislation, regulatory surveillance, rules and procedures, training, drills

---

[38] Transcripts of these interviews are available in the NTSB's public docket for this accident.

and briefings, administrative controls (for example, permit-to-work systems and shift handovers), licensing, certification, supervisory oversight and—most critically—front-line operators, particularly in highly automated control systems.

Also—

'Hard' defenses include such technical devices as automated engineered safety features, physical barriers, alarms and annunciators, interlocks, keys, personal protective equipment, non-destructive testing, designed-in structural weaknesses (for example, fuse pins on aircraft engine pylons) and improved system design.

Rules and procedures can provide a layer of protection, but they do not constitute all the layers of protection that would be expected in a safe system. (Reason 1997, p. 7) Safety experts (for example, Reason 1997, pp. 49–51) do not support the notion that a focus on rules compliance can completely assure safety.

## 1.16.2 Federal Railroad Administration Role in Safety Management Systems

The FRA has introduced, but has not yet enacted, an SMS regulation for the intercity and commuter passenger railroads the FRA regulates. In 2012, the FRA published an NPRM that included a draft of 49 *CFR*, Part 270, System Safety Program. (*Federal Register* 2012, 55372) The FRA published the final rule on August 12, 2016. (*Federal Register* 2016, 53850) The regulation required intercity and commuter passenger railroads to provide a formal plan to implement key aspects of SMS, including risk management strategies. The FRA indicated that "an SSP provides a railroad with the tools to systematically and continuously evaluate its system to identify hazards and the resulting risks gaps in safety and to mitigate or eliminate these hazards and risks." Although the effective date of the regulation initially was October 11, 2016, the regulation has been stayed four times. Most recently, the FRA published a stay of the regulation effective June 2, 2017, until December 4, 2017. (*Federal Register* 2017, 26359)

## 3.9 Safety Oversight

Numerous unsafe conditions were uncovered in the investigation that contributed to the hazards of the work environment on the day of the accident. These safety shortcomings ranged from individual and crew actions to procedural and oversight work practices that facilitated unnecessary risks and increased the likelihood of the accident. These unsafe active failures and latent conditions combined to result in a fatal accident. While mistakes are expected in human work systems, the multitude of unsafe conditions observed indicates a systemic problem. The active failures that occurred indicate that safety was consistently a low priority in the decision-making process of the employees involved. The presence of the unsafe latent conditions indicates that management failed to proactively identify and mitigate unsafe conditions. Indeed, no fewer than 29 active failures and latent conditions were identified:

**Medical Active Failures**

1. The backhoe operator ingested drugs that could have negatively impacted his ability to perform his work safety.

2. The track supervisor ingested drugs that could have negatively impacted his ability to fulfill his supervisory responsibly of ensuring that his subordinates were following safe work practices.

3. The train engineer ingested drugs that could have negatively impacted his ability to operate the train safety.

**Medical Latent Conditions**

4. Roadway workers were not subject to random drug screening.

**Maintenance of Way Active Failures**

5. The night foreman released foul time with workers and equipment on the track.

6. The night foreman communicated with a cell-phone instead of a radio, which prevented other workers from discovering that he was releasing his foul time authority.

7. The day foreman did not request foul time authority, even though the night foreman had departed the work site and workers and equipment were fouling track 3.

8. The day foreman did not conduct a meaningful job briefing.

9. Several employees signed a job briefing signature sheet, even though they were not given a job briefing, and did not exercise their right to make a good-faith challenge.

10. The day foreman circulated a job briefing signature sheet while the track was unprotected.

11. The RailVac superintendent (a contractor) requested a job briefing before initiating work, but even upon being prompted, the day foreman did not conduct a job briefing.

12. The day foreman told the RailVac superintendent that several tracks were protected with foul time when they were not.

13. The day foreman told the watchman that several tracks were protected with foul time when they were not.

14. Neither the night foreman nor the day foreman applied SSDs.

15. The day track supervisor did not stop the ongoing work due to the lack of SSDs.

16. The day track supervisor was actively performing the job of a roadway worker, rather than ensuring that his subordinates were following safe work practices.

17. The watchmen did not have adequate sight distance to see approaching trains and could not provide adequate protection. He did not stop the ongoing work with a good faith challenge.

**Maintenance-of-Way Latent Conditions**

18. Amtrak did not require or encourage an SSWP be prepared for the 55-hr track work.

19. Amtrak did not have a formal shift transfer procedure for the dispatcher and the foremen that verified the use of SSDs.

20. Workers reported that radios did not work well in the area, which resulted in cell phone communications and reduced situation awareness for track workers.

21. Amtrak management did not assure that roadway workers were equipped, properly trained, and diligently used SSDs. Amtrak management did not have an efficiency testing code for SSD use.

22. Without applying SSDs to the track as a redundant safety protection, the track occupancy logic of the signal system was not enabled at the time of the accident.

**Dispatcher Active Failures**

23. The day train dispatcher did not verify that SSDs had been applied.

24. The day train dispatcher engaged in personal phone calls while on duty.

25. The day train dispatcher did not call the day foreman to verify that track 3 was clear before authorizing a train to proceed on it, even though he was anticipating that the day foreman was going to call and request foul time for the track "within seconds."

26. The day train dispatcher authorized a train to proceed through the work area at maximum authorized speed, rather than requiring a slower speed as a precaution.

**Dispatching Latent Conditions**

27. Amtrak rules did not require speed restrictions for trains passing ballast vacuuming work, and the speed restrictions that they did have required that trains proceed at 80 mph, which is not slow enough to significantly mitigate the risk associated with construction zones.

28. Amtrak rules did not prohibit dispatchers from engaging in personal phone calls while on duty.

29. Amtrak supervisor expectations for dispatchers emphasized on-time performance over safety.

As discussed earlier, Reason (2013, pp. 82–83) has maintained that an increased number of active failures and latent conditions are a manifestation of a weak safety culture. Therefore, the NTSB concludes that the 29 active failures and latent conditions indicate a systemic problem with Amtrak's safety culture. Consistent with this conclusion, further investigation revealed several safety deficiencies at various organizational levels at Amtrak. This section of the report details these issues.

### 3.9.1 First-Line Safety Oversight

Amtrak had three safety programs at the time of the accident—Safe-2-Safer, C³RS, and the Safety Liaison Program—but none of these programs ensured the safety of the workers involved in the accident. The workers belonged to unions that had chosen not to participate in Safe-2-Safer and C³RS. According to the union representatives, the Safe-2-Safer program was inferior to a previous safety program, and they preferred an older close-call policy, which had been cancelled in 2014, over C³RS. Also, the union representatives indicated that the implementation of the Cardinal Rules had contributed to labor employees' fearing that they would lose their jobs if they reported rule violations. Amtrak management indicated that the Cardinal Rules were not new concepts; they were fundamental railroad safety principles. Beyond this, Amtrak management generally did not acknowledge the union concerns.

It is concerning that Amtrak and its unions allowed safety to become a labor-management contract negotiating issue. The lack of participation in the C³RS and Safe-2-Safer programs trivialized safety and made the work environment less safe for everyone, including Amtrak employees, contractors, and the traveling public. It is also concerning that Amtrak was aware of the unions' refusal to participate in Safe-2-Safer and C³RS, yet the company failed to resolve the unions' objections and effectively mitigate these safety shortcomings.

Amtrak's third safety program, the Safety Liaison Program, was ineffective, which likely was a consequence of the program's being understaffed; there was no safety liaison present at the work site on the day of the accident. Although the Safety Liaison Program could be an effective safety management program if implemented and resourced properly, it is concerning that Amtrak's senior leadership tolerated the ineffective, under-resourced program and failed to collaboratively establish a pervasive and robust safety solution for all jobs potentially encroaching on its passenger railways, especially the busy NEC.

This concern is heightened by the recognition that Amtrak knew that its two other safety programs were rendered defunct and inoperable by their labor management practices. That is, Amtrak's senior leaders should have recognized the serious system safety deficiency of nonparticipation in the safety programs. Collaboration is needed to maximize safety in systems, because safety issues often involve interactions among parts of the system. It is important to understand how a change in one subsystem of a complex system may affect other subsystems within that system. As NTSB Board member Christopher A. Hart said in his October 10, 2017, presentation to the ORCHSE Strategies Executive Business Issues Forum in Arlington, Virginia, *Using Collaboration to Improve Workplace Safety*, collaboration improves the processes of identifying potential issues, prioritizing the issues, developing solutions, and evaluating whether the solutions are effective.[48] For these safety-critical processes to occur, a shared trust between the stakeholders is imperative.

NTSB Board member Christopher A. Hart provided an example of the effectiveness of collaboration in the aviation industry in a September 28, 2017, key note address to the National Association of State Motorcycle Safety Administrators in Burlington, Vermont. Hart noted that in the 1990s, the FAA, airlines, air traffic controllers, airports, and pilots all began a collaborative effort to reduce the fatal accident rate. By coordinating their safety management efforts, the fatality rate was decreased by more than 80 percent in only 10 years, and the last fatal crash of a US airliner was in 2009.[49]

At the time of the accident in Chester, a weak relationship between Amtrak's management and the unions undermined the effectiveness of Amtrak's system safety efforts. Specifically, a lack of collaboration between Amtrak's management and labor resulted in two programs' being inoperable. A third program was understaffed and underdeveloped. Therefore, the NTSB concludes that Amtrak's safety programs were deficient and failed to provide effective first-line safety oversight. The NTSB recommends that Amtrak work with labor to achieve full participation in all applicable safety programs. The NTSB also recommends that Brotherhood of Maintenance of Way Employes Division, American Railway and Airway Supervisors Association, Brotherhood of Locomotive Engineers and Trainmen, and Brotherhood of Railroad Signalmen work with Amtrak to improve the effectiveness of all applicable safety programs.

### 3.9.2 Reporting Systems

Several Amtrak managers and executives told NTSB investigators that they believed rule compliance was the central tenet of safe railroad operations. Amtrak's reliance on rule compliance was also reflected in their policies. For instance, the Cardinal Rules were implemented with the goal of increased rule compliance. Interviews with Amtrak leaders and a review of the Cardinal Rules policy suggest that Amtrak endorses a Person Model of error, which, as noted by James Reason, is the most commonly held view of errors. (Reason 2013, p. 101) The Person Model places the origin of error squarely on the people in direct contact with the system. Reason observes

---

[48] Christopher A. Hart, presentation slides, Executive Business Forum Presentation, Using Collaboration to Improve Workplace Safety (https://www.ntsb.gov/news/speeches/CHart/Documents/hart-20171010.pdf).

[49] Christopher A. Hart, Transcript, Keynote Address to the National Association of State Motorcycle Safety Administrators, Burlington, Vermont) (https://www.ntsb.gov/news/speeches/CHart/Pages/hart_20170928.aspx).

that typical remedial measures derived from this model include "naming, blaming, shaming, retraining, fear appeals, and writing another procedure." He notes that "managers like the model because it separates the errant individuals from the organization in which he or she works."

As Reason (1990) observes, the Person Model is ineffective because it isolates the person from the context in which the error was made. The Cardinal Rules program was ineffective for the same reason. The rules placed the burden for safety on workers, and did not hold supervisors or managers accountable for safety. For instance, consider the 10th Cardinal Rule—Failure to comply with applicable RWP procedures. Under this rule, the foremen involved in the accident could have been terminated for failing to use SSDs. However, the foremen did not have access to SSDs, and so it would have been impossible for them to follow the rule. In addition, Amtrak management should have been aware of the need to provide training and reliable equipment to shunt track; this was identified in 1988 after the *Night Owl* accident. Thus, the lack of SSDs was an upstream system safety shortcoming that Amtrak management failed to address. Using the Cardinal Rules to terminate the foremen would not have addressed the underlying safety problem. In addition to being ineffective, Amtrak's Cardinal Rules program led to incompatibility with Amtrak's other safety programs.

If an effective reporting system had been in place, management would have been aware of the systemic failures to use SSDs. However, many employees were not participating in Safe-2-Safer or C³RS, and the Safety Liaison Program was still "evolving." In addition, the unions reported frustration over the incompatibility of the Cardinal Rules with the other three safety programs, which were intended to be nonpunitive. However, Amtrak records revealed that employees had been terminated for violating Cardinal Rules. Also, it was unclear how the Cardinal Rules were intended to synchronize with the other Amtrak safety programs. For instance, discussions with Amtrak management revealed that the likelihood of reprimand for rule violations depended largely on who discovered the violation. That is, if a safety liaison discovered a safety rule violation, counseling would occur, but not reprimand. On the other hand, if a supervisor discovered the violation of a Cardinal Rule, the incident would be reported to management, which would review the violation and consider termination.

It does not appear that Amtrak management considered the negative impact the Cardinal Rules have when implemented alongside the other safety programs. Employees who fear that they may lose their jobs for violating a rule have a disincentive to report safety issues. Also, this fear discourages employees from reporting the unsafe behaviors of others, because employees likely fear that they will get their coworkers in trouble. Although Amtrak's Cardinal Rules, many of which stem from FRA regulations and common safety practices, may have been intended to enforce safety on the railroad, an unintended consequence of their implementation was the reduction of reporting of safety-critical information.

Amtrak and FRA rules and their rule enforcement play essential roles in safe railroad operations. However, the establishment and enforcement of rules can undermine workers' perception that Amtrak has a just culture, which is "an atmosphere of trust in which people are encouraged, even rewarded, for providing essential safety-related information." (Reason 1997, p. 195) After Amtrak's leadership penalized Cardinal Rule violators by automatically considering their firing, union workers perceived Amtrak as unfair and became unwilling to report

safety-critical information. The reaction of the unions placed Amtrak's management in a weak position to identify and mitigate hazards.

A System Model of error, as opposed to the Person Model, is more effective. (Reason 2013, p. 102) From a systems perspective, it is recognized that humans are fallible and errors are to be expected, even in the best organizations. As Reason (2013, p. 102) observed, when taking a system perspective, "errors are seen as consequences rather than causes," and therefore, organizations must examine system factors to understand the origin of errors. To successfully identify and address system factors, it is imperative that safety data are accurately collected and acted upon. Viable reporting systems are necessary to collect safety-critical information. Two factors affect the viability of reporting systems: (1) Employees must not be afraid that they (or their coworkers) will experience reprisal for using them and (2) Employees must trust that their using reporting systems will be rewarded with improvements in safety, because management will act on the information they provide to address identified hazards in a timely manner. Union representatives reported high levels of fear among employees and indicated that they did not believe Amtrak's reporting systems (particularly Safe-2-Safer) were effective. Therefore, the NTSB concludes that Amtrak did not have a viable reporting system in place to collect safety-critical information. The NTSB therefore recommends that Amtrak work collaboratively with labor to develop and implement a viable safety reporting system (for example, C[3]RS); ensure that employees do not experience reprisal for using the system; respond quickly to the data collected; and communicate any resulting safety improvements to all employees. The NTSB also recommends that Brotherhood of Maintenance of Way Employes Division, American Railway and Airway Supervisors Association, Brotherhood of Locomotive Engineers and Trainmen, and Brotherhood of Railroad Signalmen work collaboratively with Amtrak to develop and implement a viable safety reporting system (for example, C[3]RS).

### 3.9.3 Corporate Safety Knowledge and Vision

NTSB investigators examined the state of safety management across Amtrak's management at the time of the accident. Investigators discovered that substantial differences in attitudes and beliefs regarding safety existed among division managers and corporate executives. Some of these individuals conveyed to investigators a strong commitment to safety, as well as a deep knowledge of system safety principles, while others did not convey that they clearly understood or implemented safety management.

The inconsistent knowledge and views of safety among Amtrak's managers and executives indicates a significant shortcoming in the company's safety culture. It is well established in the literature that effective safety cultures emanate from the top of an organization, embody a set of clear and measurable objectives, and engender shared values and attitudes about safety throughout all levels of an organization. (Reason 1997, 191–220) However, the differing visions of safety within Amtrak have contributed to a failure to establish effective assurances that safety objectives are understood and achieved in a common, progressive manner. Therefore, the NTSB concludes that the lack of consistent knowledge and vision for safety across Amtrak's management created a culture that facilitated and enabled unsafe work practices by employees.

The numerous unsafe behaviors that occurred at the work site leading up to the accident are symptomatic of a deficient safety culture at Amtrak. Although each of the unsafe behaviors

can be linked to the catastrophic event, the behaviors were enabled by and attributable to failures in the safety attitudes of the individuals involved and the safety management provided by Amtrak. For Amtrak to address the safety issues identified in this report, a systemwide overhaul likely will be required. Amtrak must address the organizational deficiencies that allowed all the active failures to occur. The most logical and effective way for Amtrak to improve safety is to develop and implement a comprehensive SMS program.

The importance of SMS programs in improving safety is widely recognized in transportation, and there are numerous resources available from this industry. The FAA and the Federal Transit Administration have provided guidance on the implementation of SMS programs.[50] Also, Amtrak has already voluntarily developed an SSPP, which contains elements of an SMS program. Amtrak's existing SSPP could provide the foundation to meet pending FRA regulation (49 *CFR* Part 270, System Safety Program). Thus, Amtrak has an existing platform and resources upon which to expand its system safety efforts.

However, it is important to recognize that an SSPP is only a written plan, and cannot ensure safety without adequate promotion from senior leadership. In the current accident, unions were allowed to opt out of safety programs, that is, Safe-2-Safer and C$^3$RS. Without employee participation, the SSPP was ineffective, because Amtrak was not able to work with employees to identify and mitigate hazards.

For an SMS program to be effective, Amtrak's leadership must fully endorse it, fund it, and promote it with a comprehensive communication strategy that reaches all levels of the organization. In addition, the unions must fully endorse and promote the SMS for it to be effective. An SMS program must start with a clear vision of safety. A core safety doctrine based on safety principles and best practices, promoted as a corporate value for all workers, is needed. Senior leadership could endorse the core safety doctrine and its safety guidance by making it a requirement for employment for all workers.

Amtrak also must address the specific organizational deficiencies identified in this report. To address the weak safety culture at Amtrak, senior leadership must stop blaming employees for errors and adopt a system perspective. Senior leadership must address employee fear and engage with workers to correct safety issues. Employees and contractors cannot experience reprisals or negative outcomes for their use of any safety management initiative that incorporates a reporting system intended to collect information on safety vulnerabilities and weaknesses.

With respect to safety initiatives, Amtrak must improve existing programs, or develop new ones, for all employees and contractors that facilitate employee acceptance of and adherence to best safety practices, and that provide effective first-line supervision. To ensure the effectiveness of these safety management initiatives, Amtrak must continuously collect, analyze, and act on safety performance metrics. The data collected should be work-process oriented and include leading indicators of employee acceptance and adoption of the safety initiatives (for example, utilization of reporting systems). Reports of these programs should be provided to Amtrak's senior

---

[50] (a) See FAA Safety Management System Initiative (https://www.faa.gov/about/initiatives/sms/).

(b) FTA Safety Management System Page (https://www.transit.dot.gov/regulations-and-guidance/safety/safety-management-systems-sms).

leadership and to those who should promote the safety initiatives, confirm that they are effective, and ensure that the data derived from them is acted upon in a timely manner. Additionally, senior leadership must ensure that its safety initiatives are not rendered ineffective because of insufficient funding, staffing, or labor-management negotiations.

The evidence uncovered over the course of the investigation revealed that Amtrak's strategies to manage safety were deficient. Therefore, the NTSB concludes that Amtrak did not have an effective SMS program. The NTSB recommends that Amtrak work collaboratively with labor in an effort to develop a comprehensive SMS program that complies with pending FRA regulation 49 *CFR* Part 270, System Safety Program, and that vitalizes safety goals and programs with executive management accountability; incorporates risk management controls for all operations affecting employees, contractors, and the traveling public; improves continually through safety data monitoring and feedback; and is promoted at all levels of the company. The NTSB also recommends that once Safety Recommendation R-17-26 is completed, Amtrak implement the SMS program throughout the company with resources sufficient to ensure that all levels of management and all labor unions involved with Amtrak operations accept and comply with the system. The NTSB also recommends that Brotherhood of Maintenance of Way Employes Division, American Railway and Airway Supervisors Association, Brotherhood of Locomotive Engineers and Trainmen, and Brotherhood of Railroad Signalmen work collaboratively with Amtrak in an effort to develop a comprehensive SMS program that complies with pending FRA regulation 49 *CFR* Part 270, System Safety Program, and that vitalizes safety goals and programs with executive management accountability; incorporates risk management controls for all operations affecting employees, contractors, and the traveling public; improves continually through safety data monitoring and feedback; and is promoted at all levels of the company.

### 3.9.4 Government Regulation of Safety Management

The FRA has introduced, but has not enacted, a regulation to mandate formal system safety program plans at 49 *CFR* Part 270, System Safety Program. (*Federal Register* 2016, 53850) (*Federal Register* 2017, 26359) This regulation would help improve passenger rail safety by advancing system safety standards in the industry. However, after four delays, these safety improvements have yet to materialize. Therefore, the NTSB concludes that by delaying progressive system safety regulation, the FRA has failed to maximize safety for the passenger rail industry and the traveling public. The NTSB recommends that the FRA enact 49 *CFR* Part 270, System Safety Program without further delay.

# 4 Conclusions

## 4.1 Findings

1.  The track structure, signals, and mechanical equipment did not contribute to the accident.

2.  The track supervisor had used two different opioids at some point before the accident, but based on behavioral evidence, drug-induced impairment of his job performance could not be determined.

3.  The Amtrak engineer took timely and appropriate actions to stop the train and to warn the roadway workers about the train approaching their work area.

4.  Although there was no operational evidence of impaired performance by the engineer, his use of marijuana was illicit and had not been deterred by his participation in the US Department of Transportation drug testing program, and any previous marijuana use had not been detected by random drug testing.

5.  Amtrak did not effectively assure that its employees, especially those in safety-sensitive positions, were drug-free while performing their public transportation duties.

6.  Had the two roadway workers used cocaine, codeine, or morphine with some regularity, been subject to random urine drug screening, and been selected for testing, their use of cocaine and opiates may have been detected before the accident.

7.  The absence of a random drug testing program for maintenance-of-way employees at the time of the accident meant there was no effective program to deter the maintenance of way employees from using drugs.

8.  The participation of the two roadway workers in the pool for random testing might have deterred them from using cocaine and opiates.

9.  The result of the night foreman's actions and the day foreman's inactions based on their conversation was that tracks 1, 3, and 4 were not protected with foul time from about 7:30 a.m. until 7:50 a.m. when the accident occurred.

10. Had the two foremen communicated with the train dispatcher jointly about the transfer of fouls from one foreman to the other, it is likely that on-track safety and protection would not have lapsed and the accident would not have happened.

11. The inadequate and inconsistent use of supplemental shunting devices by Amtrak engineering personnel effectively defeated the roadway worker protection component of Amtrak's Advanced Civil Speed Enforcement System and thereby placed maintenance-of-way employees, equipment, and the traveling public at greater risk of harm.

12. Had the foremen ensured supplemental shunting devices were in place, the accident would not have occurred.

13. There was wide acceptance at Amtrak of not using supplemental shunting devices.

14. A specific efficiency test code for the foul time process that assesses supplemental shunting device use would give Amtrak the ability to monitor and improve supplemental shunting device compliance and change the culture of noncompliance.

15. Had the Federal Railroad Administration required shunting as recommended by the National Transportation Safety Board in Safety Recommendation R-08-06, the accident would not have occurred.

16. Amtrak management should have recognized that the project rose to a heightened level of hazard that required a detailed review or site-specific work plan before it began.

17. Safety hazards exist at complex smaller projects, and these hazards should be assessed and addressed with site-specific work plans.

18. Disengagement by a supervisor from a critical and regulated safety communication process reduces safety layering and at a minimum encourages other lax safety habits.

19. Had the supervisor been engaged with his duties and responsibilities, a proper and thorough job briefing would likely have been conducted and the employees would have had an opportunity to ask the day foreman how on-track safety was to be provided.

20. Had the day foreman conducted a thorough job briefing for all workers on the day shift, including the supervisor, before the work began, foul time protection or the lack thereof and which foreman had the foul time likely would have been discussed and then rectified or mitigated by removal of the backhoe from track 3.

21. Each employee present at the work site had the obligation to demand that a proper job briefing be conducted before they signed the safety briefing sheet.

22. The supervisory oversight in Amtrak's dispatcher center did not adequately monitor dispatcher responsibilities to ensure that supplemental shunting devices were used.

23. The personal phone calls made by the day train dispatcher while he was on duty distracted him from performing his job.

24. Amtrak's ongoing infrastructure work creates an increased exposure of roadway workers to incidents like the one at Chester.

25. Had Amtrak instructed dispatchers to operate trains at significantly slower speeds through the Chester work zone, the severity of the accident would have been diminished.

26. Amtrak's rules and supervisor expectations for dispatchers did not adequately emphasize safety.

27. The 29 active failures and latent conditions indicate a systemic problem with Amtrak's safety culture.

28. Amtrak's safety programs were deficient and failed to provide effective first-line safety oversight.

29. Amtrak did not have a viable reporting system in place to collect safety-critical information.

30. The lack of consistent knowledge and vision for safety across Amtrak's management created a culture that facilitated and enabled unsafe work practices by employees.

31. Amtrak did not have an effective safety management system program.

32. By delaying progressive system safety regulation, the FRA has failed to maximize safety for the passenger rail industry and the traveling public.

## 4.2 Probable Cause

The National Transportation Safety Board determines that the probable cause of the accident was the unprotected fouled track that was used to route a passenger train at maximum authorized speed; the absence of supplemental shunting devices, which Amtrak required but the foreman could not apply because he had none; and the inadequate transfer of job site responsibilities between foremen during the shift change that resulted in failure to clear the track, to transfer foul time, and to conduct a job briefing. Allowing these unsafe actions to occur were the inconsistent views of safety and safety management throughout Amtrak's corporate structure that led to the company's deficient system safety program that resulted in part from Amtrak's inadequate collaboration with its unions and from its failure to prioritize safety. Also contributing to the accident was the Federal Railroad Administration's failure to require redundant signal protection, such as shunting, for maintenance-of-way work crews who depend on the train dispatcher to provide signal protection, prior to the accident.

# EXHIBIT 26

```
 1               UNITED STATES DISTRICT COURT

 2          WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3  _____

 4  DALE SKYLLINGSTAD,            )
    individually,                 )
 5                                )
                 Plaintiff,       )
 6                                )
         vs.                      )  2:18-cv-00648-BHS
 7                                )
    NATIONAL RAILROAD PASSENGER    )
 8  CORPORATION d/b/a AMTRAK,     )
                                  )
 9               Defendant.       )
    _____
10

11      VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

12                    CHRIS BRADASICH

13                  ***CONFIDENTIAL***

14  _____

15

16

17                    1:47 p.m.

18              FEBRUARY 13, 2019

19          1420 FIFTH AVENUE, SUITE 4200

20              SEATTLE, WASHINGTON

21

22

23

24  REPORTED BY:  JUDY STEENBERGEN-WEBB, CCR NO. 2495

25
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  plan.  So it been rolled into that as the official.

2       Q.  How about this.  Prior to the derailment was

3  the unofficial foreman's guide for qualification, was

4  that contained on Amtrak's intranet?

5       A.  That I'm not sure.

6       Q.  Do you know what I'm talking about with the

7  intranet?

8       A.  Yes.

9       Q.  All right.  Do you know if the system general

10 road foreman ever signs off on training given to

11 engineers?

12      A.  Are you referring to them actually qualifying

13 engineers?

14      Q.  No.  I'm just talking about the actual format

15 of training.

16      A.  I don't quite understand.

17      Q.  I mean I'm assuming that the system general

18 foremans, they're not the ones getting in the engines

19 and qualifying them?

20      A.  No.

21      Q.  My question is do you know any specific system

22 general foremen who authors or is involved in

23 implementing the training for engineers to be qualified

24 on a territory?

25      A.  They're not involved directly.

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1      Q.   Okay.  How are they involved indirectly?

2      A.   Making sure that the road foremen are

3  complying with, following the proper procedures for

4  qualifying that person.

5      Q.   And how do they do that?

6      A.   Through auditing through our testing system,

7  which is now called Spartan.

8      Q.   Spartan?

9           Was Spartan the same -- well, what was Spartan

10  back in December of 2017?

11      A.   It was called TESTS, T-E-S-T-S.

12      Q.   And what is TESTS, TE -- what is that?

13      A.   That's for documenting all like our

14  operational testing and qualification.

15      Q.   And that's on the intranet, correct?

16      A.   That's accessed through the intranet.

17      Q.   Yeah.  So the system general foreman would

18  have access to that documentation via the intranet,

19  correct?

20      A.   Yes.

21      Q.   And those people are located in Delaware,

22  right?

23      A.   Yes.

24      Q.   Bear with me one second.  Okay, Chris?

25           When were you promoted to road foreman?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

 1      A.  August of 2014.

 2      Q.  And you're based out of Seattle?

 3      A.  Yes.

 4      Q.  Have you always been based out of Seattle?

 5      A.  No.

 6      Q.  Where were you based out of before?

 7      A.  Los Angeles.

 8      Q.  Better weather there, I think.  Do you

 9  disagree?  That's okay.  You can disagree.

10          For the TESTS, the system, did you upload the

11  results of the engine -- the engineers' qualification

12  runs after they were qualified?

13      A.  As far as I'm aware of.  Yes.

14      Q.  Okay.  And what type of information would you

15  have included in the TESTS protocol or --

16      A.  There's a form that's called an 1875, which

17  it's an evaluation for the qualifying trip.

18      Q.  Okay.

19      A.  And it has different criterias, and then we

20  have to rank each one.

21      Q.  Did you do that for Steve Brown?

22      A.  Yes.

23      Q.  Have you ever looked at Steve Brown's employee

24  file?

25      A.  Be more specific.


206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

# EXHIBIT 27

```
 1              UNITED STATES DISTRICT COURT

 2         WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3   _____

 4   DALE SKYLLINGSTAD,            )
     individually,                )
 5                                 )
               Plaintiff,          )
 6                                 ) 2:18-cv-00648-BHS
         vs.                       )
 7                                 )
     NATIONAL RAILROAD PASSENGER   )
 8   CORPORATION d/b/a AMTRAK,     )
                                   )
 9               Defendant.        )
10   _____

11      VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION OF

12                      KURT LAIRD

13   _____

14

15

16

17                     8:10 A.M.

18                   MARCH 6, 2019

19            1420 FIFTH AVENUE, SUITE 4200

20                 SEATTLE, WASHINGTON

21

22

23

24   REPORTED BY:  JUDY STEENBERGEN-WEBB, CCR NO. 2495

25
```

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1          MR. WACKERBARTH:  Off the record.

2          VIDEOGRAPHER:  Going off the record at

3   9:15.

4          (Deposition Exhibit 10 was marked for

5           identification.)

6          (Recess taken.)

7          VIDEOGRAPHER:  We are back on the record

8   at 9:17.

9      Q.  (BY MR. DRISCOLL)  Sir, what I've marked as

10  Exhibit 10 is Tanner -- is it -- how do you pronounce

11  his last name?

12     A.  Lingafelter.

13     Q.  Lingafelter's PC exam, which you've testified

14  that you've seen before but after the occurrence, true?

15     A.  Correct.

16     Q.  Okay, and who was Tanner?

17     A.  Conductor was his position.

18     Q.  Okay.  Was he a qualifying conductor?  Was he

19  a qualified conductor?

20          What was his position on 501 on December 18th,

21  2017, to the best of your understanding and knowledge?

22     A.  I believe he was a qualifying conductor.

23     Q.  Okay.  So if we look at Exhibit Number 10,

24  does that address Curve 19.8?

25          MR. WACKERBARTH:  And just for the

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

1  record, did you get that as a qualifying conductor or a

2  qualified conductor?

3              MR. DRISCOLL:  I think he said

4  qualifying.  He didn't say qualified.  He said

5  qualifying.

6              MR. WACKERBARTH:  Is that what you

7  recorded?

8              THE REPORTER:  Qualifying.

9              MR. WACKERBARTH:  Thank you.

10     A.  I'm sorry, could we repeat the question after

11  that conversation?

12     Q.  (BY MR. DRISCOLL)  Sure.

13         What's been marked as Exhibit Number 10 is the

14  PC exam for the qual -- or the conductor qualifying

15  exam for Tanner, correct?

16     A.  Correct.

17     Q.  All right.  Where in the PC exam does it

18  discuss Curve 19.8?

19     A.  I don't see it in this document.

20     Q.  Where in the exam does it identify that the

21  conductor needs to alert the engineer of the Curve 19.8

22  and the FAST Act requirements?

23     A.  I do not see it in this document.

24     Q.  Now, this was the -- it looks like his date

25  was taken was 11/27/2017, correct?

206 622 6875 | 800 831 6973
production@yomreporting.com
www.yomreporting.com

```
 1        A.   That's correct.  Yes.

 2        Q.   So before he would been qualified and able to

 3   operate on the Lakewood Sub, he would have had to have

 4   passed this exam, correct?

 5        A.   That's correct.

 6        Q.   Okay.  It looks like it was administered by

 7   Mr. Greenwell, correct?

 8        A.   Correct.

 9        Q.   So the PC test that was given to the

10   conductors did not identify Curve 19.8 as a curve that

11   met the criteria of the FAST Act; is that correct?

12                   MR. WACKERBARTH:  Object to the form.

13        A.   It does not reference Milepost 19.8.

14        Q.   (BY MR. DRISCOLL)  That's a problem, right?

15                   MR. WACKERBARTH:  Object to the form.

16        A.   I think in our, you know, review afterwards of

17   the incident, that's one of the things the

18   corporation's looking at to see -- to look at PC exams

19   and information that's covered in it.

20        Q.   (BY MR. DRISCOLL)  Well, my question was a

21   little different.

22             Do you find it to be a problem that a curve on

23   a service that Amtrak was operating met the criteria

24   for the FAST Act, which required a conductor to warn an

25   engineer about the upcoming curve, and it was not
```

206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

1   included in the PC exam.

2           Do you find that to be problematic?

3                  MR. WACKERBARTH:  Object to the form.

4   Compound.  Argumentative.  Asked and answered.

5       A.  I believe the test could be improved by

6   mentioning Milepost 19.8 and the curve at that

7   location.

8       Q.  (BY MR. DRISCOLL)  Is there any criteria set

9   forth through the rules department or the safety

10  department that governs what issues must be covered in

11  a PC test before it's given to an engineer or a

12  conductor?

13      A.  I don't believe there was at this time.

14      Q.  So Amtrak failed to implement policies or

15  procedures that would test engineers and conductors in

16  their PC tests to identify areas that required or met

17  the FAST Act criteria, correct?

18                 MR. WACKERBARTH:  Object to the form.

19  Argumentative.

20      A.  Once again, after this derailment or after

21  derailments, Amtrak reviews the incident to see how it

22  can improve its processes.  And at the time of this

23  derailment, I'm not aware of a policy that would have

24  had us required to put that information in there.  And

25  it certainly would have been helpful to have the



206 622 6875  |  800 831 6973
production@yomreporting.com
www.yomreporting.com

# EXHIBIT 28



NATIONAL TRANSPORTATION SAFETY BOARD
**Investigative Hearing**

Managing Safety on Passenger Railroads: Amtrak Overspeed Derailment –
DuPont, Washington; and CSX and Amtrak Train Collision – Cayce, South
Carolina.



| GROUP | F |
|---|---|
| **EXHIBIT** | |
| **10** | |

Agency / Organization

## NTSB

Title

## Interview Transcript- Conductor- DuPont

Docket ID: **DCA18HR001**

NRPC_NTSB_002819

UNITED STATES OF AMERICA

NATIONAL TRANSPORTATION SAFETY BOARD

* * * * * * * * * * * * * * * * * * *
Investigation of:                    *
                                     *
AMTRAK DERAILMENT IN DUPONT,         *
WASHINGTON ON DECEMBER 18, 2017      * Accident No.:  RRD18MR001
                                     *
* * * * * * * * * * * * * * * * * * *


Interview of:  B. TANNER LINGAFELTER
               Conductor
               Amtrak




                         Amtrak Facility
                         Seattle, Washington

                         Wednesday,
                         December 20, 2017

Free State Reporting, Inc.
(410) 974-0947

```
APPEARANCES:

RYAN FRIGO, Rail Accident Investigator
National Transportation Safety Board

STEPHEN JENNER, Ph.D., Human Performance Investigator
National Transportation Safety Board

STACY THOMPSON
Federal Railroad Administration

JOHN MAYSER
Federal Railroad Administration

MICHAEL CHAPPELL
SMART Transportation Division

SCOTT PALMER
Brotherhood of Locomotive Engineers and Trainmen (BLET)

CARL FIELDS
Brotherhood of Locomotive Engineers and Trainmen

JONATHAN HINES
Amtrak

TIM WACKERBARTH, Attorney
Lane Powell

THERESA IMPASTATO
Amtrak
(Observing)

JEFF TRENTHAM
SMART UTU Seattle Local
(Representative on behalf of Mr. Lingafelter)
```

NRPC_NTSB_002821

1   B.   In addition, this permanent speed restriction must be

2   communicated at the following location:  Northbound control signal

3   milepost 3.4.  Communication must occur not less than 1 mile from

4   the required restriction.  Conductor must take appropriate action

5   to ensure the safe operation of the train and ensure -- if

6   engineer fails to acknowledge said restriction.

7   Q.   So, during the training run -- during these five runs that

8   you did, did you guys ever pass 3.4 in a northbound move?

9   A.   We did.  And we called it out every time.

10  Q.   Okay.

11  A.    It's pretty much the only restriction we had that night

12  besides the Box 2's.  We'd call out the Box 2's when we were

13  leaving and coming in to CP Tacoma, and then when we were coming

14  north we would call out the permanent speed restriction.  And it

15  would be a reminder, permanent speed restriction coming up 3.4.

16  Q.   Was there ever any discussion about this additional

17  restriction at 19.8?

18  A.    The only conversation that happened was mentioned at that

19  curve there was 30.  But about a callout or anything like that,

20  there was no mention of it whatsoever.

21  Q.   Did any -- can you recall if anybody that you were with

22  during your training runs, if anybody brought that up as a

23  concern?

24  A.    In my training run, there was no -- there were no teachers

25  for the conductors.  I was in there with the engineer of -- or,

NRPC_NTSB_002849

1  to 52 and 55.  And then, the next one that would be applicable for

2  us would be all the way down in Ostrander, which is milepost 95.

3  Q.   Is it safe to say you don't feel it's kept up to date?

4  A.   It has not been kept up to date in any way.  So the FAST Act

5  -- Amtrak's FAST Act is not part of the Sounder timetable.  That

6  3.4 is part of the Sounder timetable.  So essentially it's their

7  version of the FAST Act.  But it's not FAST Act by Amtrak.  And so

8  -- and it -- the Lakewood Sub has not been added yet to the Amtrak

9  FAST Act.  And it has -- we have not gotten any written

10 instructions about that so far.

11 Q.   Okay.  So the Sounder timetable may be not kept up to

12 Amtrak's standards.  Is that kind of what you're saying?

13 A.   It's the other way around.

14 Q.   Other way around?

15 A.   Because, like, it -- that 3.4 right there should already be

16 in the Amtrak FAST Act, because it's --

17 Q.   I got you.  I got you.

18 A.   -- written on the Sounder timetable.

19 Q.   Yeah.

20 A.   So we already know it's there.  So it's one of those ones,

21 why hasn't that been added in there?  And why not, in the

22 training, was it not something that I -- they pushed on me?  That

23 like not only is the 3.4 something applicable, but you should also

24 have that curve down south.

25 Q.   Okay.

NRPC_NTSB_002886

# EXHIBIT 29

Page 1

1                   UNITED STATES DISTRICT COURT

2                  WESTERN DISTRICT OF WASHINGTON

3      _____

4     MADELEINE GARZA, an individual, )
                                       )
5             Plaintiff(s),            )
                                       ) Case No. 3:18-CV-05106-BHS
6          vs.                         )
                                       ) Page 1 to 110
7     NATIONAL RAILROAD PASSENGER      )
      CORPORATION d/b/a Amtrak,        )
8                                      )
              Defendant(s).            )
9      _____

10                DEPOSITION UPON ORAL EXAMINATION OF

11                     MADELEINE R. GARZA

12                     February 26, 2019
                       Olympia, Washington
13     _____

14

15

16                       Taken Before:

17                      SUE E. GARCIA
                     WA CCR #2781, RPR

18

19

20                    **CERTIFIED TRANSCRIPT**

21

22

23

24

25



Page 2

```
 1                        APPEARANCES

 2

 3   FOR THE PLAINTIFF(S):        DARRELL L. COCHRAN
                                  PFAU COCHRAN VERTETIS KOSNOFF
 4                                911 PACIFIC AVE, STE 200
                                  TACOMA, WA 98402
 5                                PH: (206) 462-4334
                                  FAX:(206) 623-3624
 6                                E-MAIL: pcvalaw.com

 7

                                  DUSTIN J. DAILEY
 8                                PUTNAM LIEB POTVIN DAILEY
                                  PO BOX 337
 9                                907 LEGION WAY SE
                                  OLYMPIA, WA 98501-1520
10                                PH: (360) 754-7707
                                  FAX:(360) 754-4474
11                                E-MAIL: dustind@putnamlieb.com

12

13   FOR THE DEFENDANT(S):       ANDREW G. YATES
                                  LANE POWELL PC
14                                1420 FIFTH AVE, SUITE 4100
                                  SEATTLE, WA 98101
15                                PH: (206) 223-7000
                                  FAX:(206) 223-7107
16                                E-MAIL: yatesa@lanepowell.com

17

18

19

20

21

22

23

24

25
```



GARZA: MADELEINE R. GARZA

Page 31

1   A    In Tukwila.

2   Q    All right.  And I want to ask you how you bought your

3        ticket.  And what I'm looking for is whether you bought

4        it at the station or online or how you purchased it.

5   A    Through the Amtrak app on my phone.

6   Q    Okay.  Was it wholly electronic, then?

7   A    Yes.

8   Q    Okay.  Did you look at any advertising or other Amtrak

9        materials before you bought this ticket?

10  A    No.

11  Q    Okay.  Did you have any understanding as to whether

12       the -- this particular trip was going to be on a new

13       route or not?

14  A    No.

15  Q    Okay.  So you didn't know that it was going to be a new

16       route?

17  A    No, I did not.

18  Q    Okay.  Do you remember anything about the accident

19       itself?

20  A    I remember the moments before and then a little bit

21       after.

22  Q    Okay.  Why don't you tell me what you do remember of

23       the moments before.

24  A    I remember hearing a rumbling and the train shaking.  I

25       remember hearing a sharp screech, like something



# EXHIBIT 30

**SALES RECEIPT**

Purchased: 12/03/2017 11:00 PM PT

Modified: 12/19/2017 12:16 PM PT

Thank you for your purchase.

1. Retain this receipt for your records.
2. Print the attached eTicket and carry during your trip.

**AMTRAK**

1 Massachusetts Ave NW
Washington, DC 20001
800-USA-RAIL
Amtrak.com

# Reservation Number - 8D7A08

## EUGENE, OR - TUKWILA, WA (One-Way)

DECEMBER 3, 2017

### Change Summary - Ticket Number 3532257559822

| | |
|---|---|
| **Original Amount Paid** | **$96.90** |
| | |
| **Subtotal** | **$48.45** |
| **Train 510: EUGENE, OR - PORTLAND (AMTRAK - UNION STATION), OR** | |
| Depart 4:30 PM, Thursday, December 21, 2017 | |
| 1 RESERVED COACH SEAT | **$48.45** |
| **Subtotal** | **$48.45** |
| **Train 508: PORTLAND (AMTRAK - UNION STATION), OR - TUKWILA, WA** | |
| Depart 7:25 PM, Thursday, December 21, 2017 | |
| 1 RESERVED COACH SEAT | **$0.00** |
| **Subtotal** | **$0.00** |
| **Revised Fare** | **$48.45** |
| **Total Charged** | **$0.00** |

## TUKWILA, WA - EUGENE, OR (Round-Trip)

DECEMBER 3, 2017

## Billing Information

MADELEINE R GARZA
24120 SE 261ST PL
MAPLE VALLEY, WA 98038

**Visa** ending in 6999 (Purchase)
Authorization Code 090002

**Total** **$96.90**

## Purchase Summary - Ticket Number 3370749581355

**Train 501: TUKWILA, WA - PORTLAND (AMTRAK - UNION STATION), OR**
Depart 6:14 AM, Monday, December 18, 2017

1 RESERVED COACH SEAT                                                    **$48.45**

**Ticket Terms & Conditions**
AMTRAK STUDENT DISCOUNT -- STUDENT ID REQUIRED
3 DAY ADV RES RQRD

|  | **Subtotal** | **$48.45** |
| --- | --- | --- |

**Train 511: PORTLAND (AMTRAK - UNION STATION), OR - EUGENE, OR**
Depart 9:45 AM, Monday, December 18, 2017

1 RESERVED COACH SEAT                                                    **$0.00**

**Ticket Terms & Conditions**
AMTRAK STUDENT DISCOUNT -- STUDENT ID REQUIRED
3 DAY ADV RES RQRD

|  | **Subtotal** | **$0.00** |
| --- | --- | --- |

**Train 508: EUGENE, OR - TUKWILA, WA**
Depart 4:30 PM, Thursday, December 21, 2017

1 RESERVED COACH SEAT                                                    **$48.45**

**Ticket Terms & Conditions**
AMTRAK STUDENT DISCOUNT -- STUDENT ID REQUIRED
3 DAY ADV RES RQRD

|  | **Subtotal** | **$48.45** |
| --- | --- | --- |
|  | **Total Charged by Amtrak** | **$96.90** |

## Passengers

Madeleine Garza



**AMTRAK** eTicket

| PRESENT THIS DOCUMENT FOR BOARDING |

RESERVATION NUMBER 8D7A08

RES# 8D7A08-03DEC17

# EUG ➤ TUK     One-Way

EUGENE, OR     TUKWILA, WA     DECEMBER 21, 2017

| TRAIN | AMTRAK CASCADES | EUGENE - PORTLAND (AMTRAK - UNION STATION) | DEPARTS | ARRIVES (Thu Dec 21) |
|---|---|---|---|---|
| 510 | Dec 21, 2017 | 1 Reserved Coach Seat | 4:30 PM | 7:05 PM |
| TRAIN | AMTRAK CASCADES | PORTLAND (AMTRAK - UNION STATION) - TUKWILA | DEPARTS | ARRIVES (Thu Dec 21) |
| 508 | Dec 21, 2017 | 1 Reserved Coach Seat | 7:25 PM | 10:22 PM |

PASSENGERS (1)     AMTRAK GUEST REWARDS

GARZA, MADELEINE     ADULT     No member number provided. Join at Amtrak.com

**Proper identification is required for all passengers.** This document is valid for only passengers listed. See www.amtrak.com/ID for details.

IMPORTANT INFORMATION

- **eTickets for Reserved services** are valid only for the specific train number, date and accommodation type booked.
- When should you arrive at the station? Check the recommended arrival times for your departure station at Amtrak.com/stations. Allow additional time if you require ticketing/baggage services or boarding assistance, or if you are boarding at a Canadian station.
- Tickets are non-transferable. They are valid only for the personal use of the passenger(s) named on the ticket.
- For Amtrak travel information, or to make adjustments to your travel plans, please visit Amtrak.com, or call 1-800-USA-RAIL (1-800-872-7245).
- Your printed eTicket travel document shows the services you booked. If you change your booking but do not reprint the document, it will not reflect your current itinerary. You may obtain an updated copy of your eTicket at Amtrak.com. At some stations, a gate agent may need to view your eTicket prior to boarding (learn more at Amtrak.com/boarding).
- Refund and exchange restrictions and penalties for failure to cancel unwanted travel may apply. See the refund/exchange policy at Amtrak.com/refund.
- Carry-on baggage is limited to 2 personal items, 14x11x7" / 25lbs per item, and 2 bags, 28x22x14" / 50lbs per bag, per passenger. **You may be charged a baggage fee or denied boarding if your items exceed these limitations.** See the baggage policy at Amtrak.com/baggage.
- Check the departure board or ask a uniformed Amtrak employee to find out where to board your train.
- **If You See Something Say Something! Contact Amtrak Police at 1-800-331-0008 or Text to APD11 (27311).**



 eTicket

## PRESENT THIS DOCUMENT FOR BOARDING

RESERVATION NUMBER 8D7A08

RES# 8D7A08-03DEC17

# TUK ► EUG    Round-Trip

TUKWILA, WA      EUGENE, OR      DECEMBER 18, 2017

### Depart

| TRAIN | AMTRAK CASCADES | | DEPARTS | ARRIVES (Mon Dec 18) |
|---|---|---|---|---|
| 501 | Dec 18, 2017 | TUKWILA - PORTLAND (AMTRAK - UNION STATION) 1 Reserved Coach Seat | 6:14 AM | 9:20 AM |
| 511 | Dec 18, 2017 | PORTLAND (AMTRAK - UNION STATION) - EUGENE 1 Reserved Coach Seat | 9:45 AM | 12:20 PM |

### Return

| TRAIN | AMTRAK CASCADES | | DEPARTS | ARRIVES (Thu Dec 21) |
|---|---|---|---|---|
| 508 | Dec 21, 2017 | EUGENE - TUKWILA 1 Reserved Coach Seat | 4:30 PM | 10:22 PM |

| PASSENGERS (1) | | AMTRAK GUEST REWARDS |
|---|---|---|
| GARZA, MADELEINE | AMTRAK STUDENT DISCNT | No member number provided. Join at Amtrak.com |

**Proper identification is required for all passengers.** This document is valid for only passengers listed. See www.amtrak.com/ID for details.

### IMPORTANT INFORMATION

• AMTRAK STUDENT DISCOUNT -- STUDENT ID REQUIRED      • 3 DAY ADV RES RQRD

• eTickets for Reserved services are valid only for the specific train number, date and accommodation type booked.
• When should you arrive at the station? Check the recommended arrival times for your departure station at Amtrak.com/stations. Allow additional time if you require ticketing/baggage services or boarding assistance, or if you are boarding at a Canadian station.
• Tickets are non-transferable. They are valid only for the personal use of the passenger(s) named on the ticket.
• For Amtrak travel information, or to make adjustments to your travel plans, please visit Amtrak.com, or call 1-800-USA-RAIL (1-800-872-7245).
• Your printed eTicket travel document shows the services you booked. If you change your booking but do not reprint the document, it will not reflect your current itinerary. You may obtain an updated copy of your eTicket at Amtrak.com. At some stations, a gate agent may need to view your eTicket prior to boarding (learn more at Amtrak.com/boarding).
• Refund and exchange restrictions and penalties for failure to cancel unwanted travel may apply. See the refund/exchange policy at Amtrak.com/refund.
• Carry-on baggage is limited to 2 personal items, 14x11x7" / 25lbs per item, and 2 bags, 28x22x14" / 50lbs per bag, per passenger. **You may be charged a baggage fee or denied boarding if your items exceed these limitations.** See the baggage policy at Amtrak.com/baggage.
• Check the departure board or ask a uniformed Amtrak employee to find out where to board your train.
• **If You See Something Say Something!  Contact Amtrak Police at 1-800-331-0008 or Text to APD11 (27311).**

# EXHIBIT 31

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

AARON HARRIS,

               Plaintiff,

    v.

NATIONAL RAILROAD PASSENGER
CORPORATION d/b/a AMTRAK,

               Defendant.

CASE NO. C18-134 BHS

ORDER GRANTING IN PART
AND DENYING IN PART
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

This matter comes before the Court on Defendant National Railroad Passenger Corporation d/b/a Amtrak's ("Amtrak") motion for partial summary judgment on plaintiff's consumer protection act claim. Dkt. 94. The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby grants in part and denies in part the motion for the reasons stated herein.

## I.  PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff Aaron Harris ("Harris") purchased a ticket to ride the Amtrak 501 train that left Seattle on December 18, 2017. Dkt. 118, ¶ 1. On the day of the trip, Harris paid $10.40 for a Lyft ride to the train station. *Id.* ¶ 3. On the way to Portland, the train

derailed and allegedly injured Harris. Sometime after January 4, 2018, Amtrak refunded the cost of Harris's ticket. *Id.* ¶ 4.

On January 12, 2018, Harris filed a complaint against Amtrak in King County Superior Court for the State of Washington. Dkt. 1-1. Harris asserts a claim of negligence for personal injuries and a claim under Washington's Consumer Protection Act ("CPA"), RCW Chapter 19.86. *Id.* On January 29, 2018, Amtrak removed the matter to this Court. Dkt. 1.

On June 27, 2019, Amtrak filed the instant motion for summary judgment on Harris's CPA claim. Dkt. 94. On July 29, 2019, Harris responded. Dkt. 114. On August 2, 2019, Amtrak replied. Dkt. 119. On August 8, 2019, Harris filed a surreply. Dkt. 129.

## II.   DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt").

*See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists

if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or

jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

626, 630 (9th Cir. 1987).

      The determination of the existence of a material fact is often a close question. The

Court must consider the substantive evidentiary burden that the nonmoving party must

meet at trial—e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477

U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.  The Court must resolve any factual

issues of controversy in favor of the nonmoving party only when the facts specifically

attested by that party contradict facts specifically attested by the moving party.  The

nonmoving party may not merely state that it will discredit the moving party's evidence

at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W.*

*Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255).  Conclusory,

nonspecific statements in affidavits are not sufficient, and missing facts will not be

presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

**B.  Amtrak's Motion**

      Amtrak moves for summary judgment on Harris's CPA claim on two grounds.

First, Amtrak argues that Harris may not recover damages for personal injury under the

CPA.  Dkt. 94 at 7–8.  This is a well-settled issue of law that Harris does not dispute.

Therefore, to the extent that Harris seeks damages for personal injuries under the CPA,

the Court grants the motion.

Second, Amtrak argues that Harris "has not produced evidence of the types of damages to 'business or property' that are recoverable under the [CPA]." Dkt. 94 at 4. In response, Harris submitted evidence of his injuries declaring that (1) he lost the use of his money between the date he purchased the ticket and the date Amtrak refunded the purchase price and (2) he paid for a ride to the train station the morning of his trip. Dkt. 118. In reply, Amtrak moves to strike Harris's declaration because he failed to timely disclose this evidence. Dkt. 119 at 3. Thus, Amtrak morphed this summary judgment motion into a discovery motion or a motion in limine. The Court declines to consider Amtrak's motion to strike because it is presented for the first time in a reply depriving Harris of the due process protections of notice and an opportunity to be heard.[1] Accordingly, the Court denies Amtrak's motion to the extent that Harris has failed to submit admissible evidence of his injury.

In the alternative, Amtrak has refunded Harris's ticket cost and offers to pay his other alleged actual damages under the CPA. Dkt. 119 at 6. Amtrak argues that, once it pays Harris's actual damages, "there is simply no injury, and no grounds to permit plaintiff's CPA claim to move forward." Dkt. 94 at 10. Amtrak provides no citation for this position, and the Court finds it to be without merit. If Harris is able to prove his CPA claim, he may recover actual damages, treble damages (up to a maximum of $25,000),

---

[1] While motions to strike are proper in a reply, Local Rules W.D. Wash. LCR 7(g), this rule is generally used to strike evidence that is inadmissible. Here, Amtrak moves to strike under Fed. R. Civ. P. 26 and 37, which necessitates notice and an opportunity to respond. Moreover, Harris's surreply on this issue is improper because it includes substantive argument. However, to the extent that Harris seeks to strike Amtrak's discovery arguments, the Court declines to consider Amtrak's arguments.

attorney's fees, and statutory costs. *See* RCW 19.86.090. Amtrak cites no authority for the proposition that paying the alleged actual damages precludes Harris from seeking these other forms of damages. Moreover, Harris seeks "injunctive relief to protect the public." Dkt. 1-1, ¶ 6.2. This request alone is sufficient to overcome summary judgment. For example, if the jury finds that Amtrak engaged in the unfair and deceptive act of selling train tickets for a route that did not comply with the federal regulations governing preventative measures at certain speed reduction locations, bridges, or tunnels, then Harris may seek an injunction to prevent such future sales in Washington. Therefore, the Court denies Amtrak's motion to the extent Amtrak asserts that Harris has been or will be reimbursed for his actual damages.

## III. ORDER

Therefore, it is hereby **ORDERED** that Amtrak's motion for partial summary judgment on plaintiff's consumer protection act claim, Dkt. 94, is **GRANTED in part** and **DENIED in part** as stated herein.

Dated this 9th day of August, 2019.

BENJAMIN H. SETTLE
United States District Judge