UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MADELEINE GARZA,<br><br>            Plaintiff,<br><br>   v.<br><br>NATIONAL RAILROAD PASSENGER CORPORATION d/b/a AMTRAK,<br><br>            Defendant. | CASE NO. C18-5106 BHS<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on Defendant National Railroad Passenger Corporation d/b/a Amtrak's ("Amtrak") motion for summary judgment on punitive damages and consumer protection act claim, Dkt. 21, and supplement re: motion for summary judgment on punitive damages and consumer protection act claim, Dkt. 30. The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby grants in part and denies in part the motion for the reasons stated herein.

## I. PROCEDURAL HISTORY

On February 13, 2018, Plaintiff Madeleine Garza ("Garza") filed a complaint against Amtrak for damages sustained when Amtrak Train 501 derailed near DuPont, Washington. Dkt. 1. Garza asserts a negligence claim and a claim for violation of Washington's Consumer Protection Act ("CPA"), RCW Chapter 19.86, and requests actual damages, punitive damages, and injunctive relief. *Id.*

On July 31, 2019, the deadline for filing dispositive motions, Amtrak filed a motion for summary judgment on Garza's request for punitive damages and on her CPA claim. Dkt. 21.

On August 9, 2019, the Court granted Amtrak's motion for summary judgment on punitive damages in a related case, *Wilmotte v. Nat'l R.R. Passenger Corp.*, C18-0086BHS, 2019 WL 3767133 (W.D. Wash. Aug. 9, 2019) ("*Wilmotte*"), and granted in part and denied in part Amtrak's motion for summary judgment on a CPA claim in another related case, *Harris v. Nat'l R.R. Passenger Corp.*, C18-134BHS, 2019 WL 3767140 (W.D. Wash. Aug. 9, 2019).

On August 16, 2019, the last business day before Garza's response was due, Amtrak renoted its motion for consideration on September 6, 2019. Dkt. 27. On August 22, 2019, Amtrak renoted its motion for consideration on September 20, 2019. Dkt. 29. On August 27, 2019, Amtrak filed a supplemental brief in support of its motion. Dkt. 30. On September 16, 2019, Garza responded to the motion and the supplement. Dkts. 32, 33. On September 20, 2019, Amtrak submitted two replies. Dkts. 36, 38.

## II.  FACTUAL BACKGROUND

The majority of the facts relevant to this motion are undisputed.  The Amtrak Cascades line operates from Eugene, Oregon to Vancouver, British Columbia.  On December 18, 2017, Amtrak began service on a new section of track on the Cascades line, which bypassed Point Defiance ("Point Defiance Bypass").  This section of track is approximately 20 miles and runs from Olympia to Tacoma, Washington. A part of the section is commonly referred to as the Lakewood Subdivision.  Sound Transit is a public transit authority serving the nearby communities which owns the Lakewood Subdivision and operates as a host railroad for Amtrak.

In response to an Amtrak derailment outside of Philadelphia in 2015, Congress passed the Fixing America's Surface Transportation Act ("FAST Act"), PL 114-94, 129 Stat. 1312.  In certain situations, the FAST Act required railroad carriers to "identify each main track location where there is a reduction of more than 20 miles per hour from the approach speed to a curve, bridge, or tunnel." § 11406, 129 Stat. at 1684–85.  Railroad carriers were required to develop speed limit action plans including "increased crew communication" to prevent overspeed derailments at the identified track locations. *Id.* Importantly, the carrier, in this case Amtrak, was responsible for meeting the requirements of the FAST Act and not the host railroad, Sound Transit. *Id.*

It is undisputed that Amtrak failed to comply with the FAST Act's requirements for the inaugural run on the Point Defiance Bypass.  At milepost 19.8 ("MP 19.8") of the Lakewood Subdivision, there is a 49 mile per hour ("mph") speed reduction curve where trains must reduce their speed from 79 mph to 30 mph.  Neither Amtrak's regional safety

1  office, located in Seattle, Washington, nor Amtrak's national safety office, located in
2  Wilmington, Delaware, included any warning of the MP 19.8 speed reduction curve in its
3  General Order for the territory covering the Point Defiance Bypass.  The General Order
4  provides the instructions for all Amtrak employees operating in the specific geographic
5  area.  Dkt. 34-2 at 7–10.  The order is intended to include a list of all FAST Act locations,
6  and the order instructs the conductor to verbally remind the locomotive engineer of the
7  upcoming speed reduction location.

8  The parties dispute which office is to blame for failing to include the speed
9  reduction curve at MP 19.8 in the General Order.  Although the parties have each
10 submitted voluminous evidence in support of their respective positions, the Court
11 declines to summarize this evidence because the evidence supports a conclusion that
12 Amtrak employees in both Seattle and Delaware were negligent by omission regarding
13 this speed reduction curve.  For the purposes of the instant motion, the Court will give
14 Garza the benefit of the doubt in finding that Amtrak's Delaware employees were more
15 negligent than the Seattle employees, which is itself a dubious conclusion.[1]

16 On December 17, 2018, the inaugural run, Amtrak 501, left the Amtrak station at
17 Tacoma, Washington heading toward MP 19.8.  As the train approached the curve, the
18 conductor failed to verbally remind the engineer of the need to reduce the train's speed to
19 30 mph.  The train entered the curve at a high rate of speed, derailed, and resulted in a
20 horrible accident killing three passengers and injuring numerous others.

---

[1] The great weight of the evidence supports the conclusion that the majority of the acts causing the incident occurred in Washington.

## III.  DISCUSSION

### A.   Procedural Issues

Garza moves to strike Amtrak's supplemental brief as an untimely dispositive motion and argues that Amtrak waived its defense of preemption.  Dkt. 32 at 3–6. Regarding the first issue, Amtrak cleverly used the local rules to renote its timely motion for summary judgment and then titled its second motion as a "supplement."  It even realized that there could be an issue with this litigation tactic by addressing prejudice to Garza in the introduction to its supplement.  Despite this questionable tactic, the Court denies Garza's motion to strike because (1) Garza was afforded sufficient notice and opportunity to be heard and (2) the Court prefers resolving all issues of law before trial.

Regarding waiver, it is undisputed that Amtrak should have included the affirmative defense of preemption in its answer.  *See Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987) ("Federal pre-emption is ordinarily a federal defense to the plaintiff's suit."); *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 345 (D.C. Cir. 2018) ("Preemption ordinarily is an affirmative defense forfeitable by the party entitled to its benefit."); Fed. R. Civ. P. 8(c) (affirmative defenses must be made in defendant's responsive pleading).  "In the absence of a showing of prejudice, however, an affirmative defense may be raised for the first time at summary judgment."  *Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir. 1993).  Here, Garza argues that Amtrak "has no conceivable excuse for failing to raise a defense based on a statute literally titled 'The Amtrak Act' that repeatedly references Amtrak."  Dkt. 32 at 5–6.  While the Court agrees with Garza on this point, Garza has failed to establish prejudice from Amtrak's untimely

assertion of its affirmative defense. In the absence of prejudice, the Court concludes that Amtrak did not waive this defense.

**B. Summary Judgment**

**1. Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477

U.S. at 254; *T.W. Elec. Serv., Inc*., 809 F.2d at 630.  The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party.  The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W. Elec. Serv., Inc*., 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255).  Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

### 2. Punitive Damages

"In resolving conflict of law tort questions, Washington has abandoned the *lex loci delicti* rule and follows the *Restatement (Second) of Conflict of Laws'* most significant relationship test."  *Singh v. Edwards Lifesciences Corp.*, 151 Wn. App. 137, 143 (2009) (citing *Johnson v. Spider Staging Corp.*, 87 Wn.2d 577, 580 (1976)).  This is a two-step inquiry involving a weighing of the parties' contacts with the two jurisdictions and then, if the contacts are evenly balanced, evaluating the public policies and governmental interests of the concerned states."  *Id*. at 143–44 (citing *Johnson*, 87 Wn.2d at 58–82).  "Washington courts have held that these same choice of law principles apply to the issue of punitive damages."  *Id*. at 144–45 (examining *Kammerer v. W. Gear Corp.*, 96 Wn.2d 416 (1981); *Barr v. Interbay Citizens Bank of Tampa, Fla.*, 96 Wn.2d 692 (1981)).

In determining which jurisdiction has the most significant relationship to a particular issue, which in this case is the availability of punitive damages, the Court weighs "(a) the place where the injury occurred, (b) the place where the conduct causing

the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Id*. at 143 (citing *Johnson*, 87 Wn.2d at 581). Although the Court should consider each category of contacts, the Court starts with the general "presumption that in personal injury cases, the law of the place of the injury applies . . . ." *Zenaida-Garcia v. Recovery Sys. Tech., Inc.*, 128 Wn. App. 256, 261–62 (2005).

In this case, as in *Wilmotte*, the significant dispute involves the place where the conduct causing the injury occurred. As set forth in *Wilmotte*, it is impossible, and most likely improper, for the Court to resolve this question of fact on causation because Amtrak's employees in both Washington and Delaware committed errors and omissions that contributed to the accident. Thus, the Court will construe the issue in the light most favorable to Garza. Even then, this is the only factor that weighs slightly in favor of applying Delaware law and comes with the caveat that Amtrak's Washington employees were also negligent. The injuries occurred in Washington, the parties' relationship is centered in Washington, Garza was domiciled in Washington, and Amtrak has offices throughout the nation, including at least one in Washington. Although Garza argues that the third and fourth factors weight in favor of applying Delaware law, Dkt. 33 at 22–24, the argument is based on the interesting theory that Delaware has an interest in punishing the misconduct that occurred within its borders and that Garza's "punitive damages claims arise from misconduct occurring in Delaware, not Washington." *Id.* at 24. Garza provides no authority for the proposition that she can parse her claims to her advantage. Garza's negligence claim is against Amtrak, and Amtrak had employees in Washington

1 and Delaware that both contributed to cause her injury. The Court must consider all these
2 contacts, not simply the one that is most helpful to Garza.

3 In conclusion, Garza has failed to overcome the presumption that Washington law
4 applies to her personal injury claims. Therefore, the Court grants Amtrak's motion on
5 Garza's claim for punitive damages.

### 3. CPA

7 Amtrak moves for summary judgment on Garza's CPA claim arguing that (1)
8 Garza has failed to establish injury to her business or property, Dkt. 21 at 21–23, (2) it is
9 expressly preempted, Dkt. 30 at 2–5, (3) she lacks standing to seek injunctive relief, *id.* at
10 5–7, and (4) she fails to establish at least three of the five elements, *id.* at 7–8. The Court
11 will address preemption and standing and then proceed to the elements of the claim.

#### a. Preemption

13 Amtrak argues that Garza's CPA claim is expressly preempted by 49 U.S.C.
14 § 24301(g) ("Amtrak Act"), which provides that "[a] State or other law related to rates,
15 routes, or service does not apply to Amtrak in connection with rail passenger
16 transportation." Dkt. 30 at 2–5. Although federal law may preempt state law in three
17 ways, Amtrak asserts express preemption in this case. For this type of preemption,
18 Congress defines "explicitly the extent to which its enactments pre-empt state law."
19 *English v. Gen. Elec. Co.*, 496 U.S. 72, 78 (1990). The analysis starts with the
20 "presumption that Congress does not intend to supplant state law." *New York State*
21 *Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654
22 (1995). The Ninth Circuit has held that "'[b]ecause consumer protection law is a field

traditionally regulated by the states, compelling evidence of an intention to preempt is required in this area." *Aguayo v. U.S. Bank*, 653 F.3d 912, 917 (9th Cir. 2011) (quoting *Gen. Motors Corp. v. Abrams*, 897 F.2d 34, 41–42 (2d Cir. 1990)).

Although the issue is thoroughly briefed, neither party recognizes the circuit split on an analogous federal statute. The Airline Deregulation Act of 1978 ("ADA") is in the same Title of the United States Code and includes an almost identical preemption provision. Specifically, the ADA provides that no state or subdivision thereof may enact or enforce a law "related to a price, route, or service of an air carrier that may provide air transportation . . . ." 49 U.S.C. § 41713(b)(1). In her dissent from the denial of a petition for certiorari, Justice O'Conner stated that the Ninth and Third Circuits have adopted a narrow interpretation of the term "service" whereas the Fourth, Fifth, and Seventh Circuit have adopted a broader definition. *Nw. Airlines, Inc. v. Duncan*, 531 U.S. 1058 (2000). The Ninth Circuit's interpretation is as follows:

> In attempting to deduce its meaning, we are mindful that principles of statutory construction require us to consider the term within its context. *See Pension Benefit Guar. Corp. v. Carter & Tillery Enters.*, 133 F.3d 1183, 1186 (9th Cir.1998). Airlines' "rates" and "routes" generally refer to the point-to-point transport of passengers. "Rates" indicates price; "routes" refers to courses of travel. It therefore follows that "service," when juxtaposed to "rates" and "routes," refers to such things as the frequency and scheduling of transportation, and to the selection of markets to or from which transportation is provided (as in, "This airline provides service from Tucson to New York twice a day.") To interpret "service" more broadly is to ignore the context of its use; and, it effectively would result in the preemption of virtually everything an airline does. It seems clear to us that that is not what Congress intended.
> Nowhere in the legislative history, or in what remains of the federal airline regulatory statutes, does Congress intimate that "service," in the context of deregulation, includes the dispensing of food and drinks, flight attendant assistance, or the like.

*Charas v. Trans World Airlines, Inc.*, 160 F.3d 1259, 1265–66 (9th Cir. 1998) (en banc), *opinion amended on denial of reh'g*, 169 F.3d 594 (9th Cir. 1999). It stands to reason that the Ninth Circuit would interpret the term "service" in the Amtrak Act in a similarly narrow way being that it is an almost identical phrase in an act that deregulated train transportation.

Amtrak, however, argues that the Court should adopt the reasoning in *Jenkins v. Nat'l R.R. Passenger Corp.*, C07-3427, 2008 WL 68685 (N.D. Ill. Jan. 3, 2008). Dkts. 30 at 3–5; 38 at 5–6. In *Jenkins*, the plaintiff alleged that Amtrak "misrepresented to [her] that the train cars used would accommodate [her] and her wheelchair and that Amtrak would provide [her] with the amenities normally offered to customers, including restrooms, dining, entertainment, comfortable seating, and communication devices." *Id.* at *2. In considering whether these amenities were services, the court adopted the Seventh Circuit's interpretation of services under the ADA, which is as follows:

> "Services" generally represent a bargained-for or anticipated provision of labor from one party to another . . . . [This] leads to a concern with the contractual arrangement between the airline and the user of the service. Elements of the air carrier service bargain include items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself.

*Id.* at *12 (quoting *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1433 (7th Cir. 1996)). This conclusion, however, is the circuit split that Justice O'Conner identified in *Duncan*. Contrary to Amtrak's position, the Court declines to adopt the *Jenkins* interpretation when there is a clearly identified circuit split because this Court is bound by Ninth Circuit law.

1        The Court, however, recognizes at least a couple reasons why *Charas* is not

2 necessarily binding.  First, *Charas* interpreted the ADA as opposed to the Amtrak Act.

3 While true, the principles underlying the Ninth Circuit's interpretation are the same.

4 "[W]e rely on the principle of *noscitur a sociis*—a word is known by the company it

5 keeps—to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its

6 accompanying words, thus giving unintended breadth to the Acts of Congress.'"  *Yates v.*

7 *United States*, 135 S. Ct. 1074, 1085 (2015) (citing *Gustafson v. Alloyd Co.*, 513 U.S.

8 561, 575 (1995)).  "A related canon, *ejusdem generis* teaches that general words

9 following a list of specific words should usually be read in light of those specific words

10 to mean something 'similar.'"  *Id.* at 1089 (Alito, J., concurring).  Under these principles,

11 it "follows that 'service,' when juxtaposed to 'rates' and 'routes,' refers to such things as

12 the frequency and scheduling of transportation, and to the selection of markets to or from

13 which transportation is provided" as in Amtrak's service from Tacoma to Olympia.

14 *Charas*, 160 F.3d at 1265–66.  Moreover, "[t]o interpret 'service' more broadly is to

15 ignore the context of its use; and, it effectively would result in the preemption of virtually

16 everything [Amtrak] does."  *Id.* at 1266.  Therefore, the Court concludes that Amtrak has

17 failed to establish that, in the Ninth Circuit, the interpretation of "service" within the

18 Amtrak Act should differ from that interpretation within the ADA.

19        Second, Amtrak argues that state consumer protection law should be distinguished

20 from the state tort claims addressed in *Charas*.  Dkt. 38 at 5 ("every case identified by

21 Amtrak and involving similar state Consumer Protection Act Claims and 'relating to . . .

22 services' statutory language have resulted in a clear finding of express pre-emption.")

(citing *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 222 (1995); *Morales v. Trans World Airlines*, 504 U.S. 374, 378 (1992); *Miller v. US. Bank of Washington, NA.*, 72 Wn. App. 416 (1994); *Jenkins*, 2008 WL 68685.) Neither *Wolens* nor *Morales* is persuasive because (1) they predate *Charas* and (2) the Ninth Circuit cited both authorities in *Charas* and still interpreted "service" narrowly. *See Charas*, 160 F.3d at 1262. *Miller* is not persuasive because the federal statute in question expressly granted oversight to the federal agency "to resolve questions of unfair and deceptive practices by national banks." 72 Wn. App. at 421. *Jenkins* is similarly unpersuasive because it relied on a different interpretation of service as explained above. Thus, Amtrak has failed to provide any binding or persuasive authority for the proposition that the Ninth Circuit's interpretation of service would preempt state consumer protection laws but not state tort laws.

Turning to the CPA, Garza must establish, among other things, an unfair or deceptive act that occurred in trade or commerce. *Trujillo v. Nw. Tr. Servs., Inc.*, 183 Wn.2d 820, 834 (2015). The CPA defines trade or commerce to "include the sale of assets or services . . . ." RCW § 19.86.010(2). Amtrak argues that the CPA expressly includes "services," meaning it is preempted as a state law regulating "service." While confusing, there exists a logical distinction between the two uses of the word "service," at least under existing Ninth Circuit precedent. For example, under *Charas*, service is interpreted as "transportation to and from various markets at various times." *Charas*, 160 F.3d at 1266. Thus, if Washington passed a law restricting Amtrak to one train per day between Vancouver and Seattle, this would seem to be preempted as a law that

affected Amtrak's service.  Similarly, if Seattle passed a law that required Amtrak to operate one hundred southbound trains per day in an effort to reduce motor traffic congestion, this would also seem to be preempted.  Thus, the use of the identical word in the two statutes is not dispositive.

Finally, Garza's claim is based on safety concerns and not the amenities or services provided during the trip.  Garza seems to claim that she would not have bought a ticket with Amtrak had she known that Amtrak's conductor was allegedly inexperienced or that Amtrak failed to implement a positive train control system or the alternative redundancy system in the trip plan.  Under this theory of the claim, Amtrak has failed to establish that the Amtrak Act would preempt a claim based on deceptive representations or material omissions as to a passenger's safety, its compliance with safety regulations, or its employee training requirements.  Therefore, the Court denies Amtrak's motion on the basis of preemption.

Although the Court has thoroughly analyzed the issue, it recognizes the circuit split on the issue of preemption and would be amenable to a motion to certify the question for interlocutory appeal if Amtrak so moved.  28 U.S.C. 1292(b).  This appears to involve "a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation . . . ." *Id.*  The Court declines to sua sponte certify the issue for appeal without allowing the parties notice and an opportunity to be heard.

### b. Standing

Amtrak argues that Garza does not have standing to seek injunctive relief because any claim as to future injury is speculative. Dkt. 30 at 5–7. Amtrak contends, and Garza does not dispute, that the issue of standing is governed by federal law. The Court agrees. Although Garza alleges jurisdiction under 28 U.S.C. §§ 1331, 1332(a), 1349, and 1367, the Court has original jurisdiction over this matter under 28 U.S.C. § 1349 because Amtrak was created pursuant to an Act of Congress and the United States owns more than 50% of Amtrak's common stock. *See* Dkt. 7 (Amtrak's corporate disclosure statement). In the absence of any authority to the contrary, the Court concludes that its original subject matter jurisdiction is confined by the limits of Article III of the Constitution.

"[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). To meet this requirement, Garza must show that she suffered an "injury in fact" that is (a) "concrete and particularized" and (b) "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal citation and quotation marks omitted).

Amtrak argues that "[t]here is no reasonable basis for [Garza] to speculate that [the train accident] will (or even could) repeat, and result in future harm to Garza - or anyone." Dkt. 30 at 7 (citing *Lyons*, 461 U.S. at 108). The Court declines to consider the reasonableness of Garza's hypothetical speculation because this issue can be decided on a separate and important issue, which is Garza has failed to provide any evidence that she

will ever ride Amtrak in the future or has a reasonable fear that if she does ride Amtrak in the future, the ride will result in personal injuries. Unlike Dale Skyllingstad, an injured passenger who testified during his trial (consolidated with the *Wilmotte* and *Harris* cases) that he still rides Amtrak, Garza fails to cite any similar evidence in the record. *See* Dkt. 32 at 13–15. In fact, Garza does not even assert these allegations in her complaint. *See* Dkt. 1. The only evidence Garza cites in support of her position is the NTSB report in which it "conclude[d] that the 29 active failures and latent conditions indicate a systemic problem with Amtrak's safety culture." Dkt. 34-3 at 39. In light of this evidence, the Court agrees with Amtrak that Garza is similarly situated to the plaintiff in *Lyons* in that she has identified future events—train rides—that may involve a likelihood of injury or death but has failed to allege or submit facts establishing that she will ever subject herself to any of those events. Therefore, the Court grants Amtrak's motion for summary judgment on Garza's request for injunctive relief.

        c.      **Elements of the CPA claim**

To prevail on her CPA claim, Garza must prove five elements: (1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to her business or property, and (5) causation. *Hangman Ridge Training Stables v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780 (1986).

In this case, Amtrak challenges the elements of Garza's claim in a brief and conclusory fashion. Dkts. 30 at 7–8, 38 at 8. Regarding the first two elements, Garza argues that Amtrak omitted matters of material importance when Garza bought her ticket. Dkt. 32 at 17–19. For example, Amtrak failed to inform Garza that it was not in

compliance with the FAST Act.  *Id.*  Amtrak argues that Garza presumes "Amtrak knew and was in a position to disclose factors contributing to derailment ahead of time." Dkt. 38 at 8.  Amtrak provides no authority for the proposition that CPA claims must be based on intentional omissions instead of negligent omissions.  Therefore, the Court rejects Amtrak's argument on this issue.

Regarding the public interest impact, Garza must show that the act "[i]njured other persons; (b) had the capacity to injure other persons; or (c) has the capacity to injure other persons." RCW § 19.86.093.  This element is easily satisfied based on the other cases alleging CPA violations due to this accident.

Regarding the injury element, the Court has rejected Amtrak's argument that when it fully refunds a passenger's fare, the passenger fails to establish injury.  *See Harris v. Nat'l R.R. Passenger Corp.*, C18-0134BHS, 2019 WL 3767140 (W.D. Wash. Aug. 9, 2019).  The Court rejects this argument again.

Regarding final element, "[c]ausation under the CPA is a factual question to be decided by the trier of fact." *Deegan v. Windermere Real Estate/Ctr.-Isle, Inc.*, 197 Wn. App. 875, 885 (2017).  Amtrak fails to show that this question should be decided as a matter of law.  Therefore, the Court denies Amtrak's motion on Garza's CPA claim.

## IV.  ORDER

Therefore, it is hereby **ORDERED** that Amtrak's motion for summary judgment on punitive damages and consumer protection act claim, Dkt. 21, and supplement re: motion for summary judgment on punitive damages and consumer protection act claim, Dkt. 30, are **GRANTED in part** and **DENIED in part** as stated herein.

Dated this 1st day of October, 2019.

BENJAMIN H. SETTLE
United States District Judge